**J. DOE and H. Doe, by their parents and next friends, David and Mary DOE, Plaintiffs–Appellants,**

v.

**CITY OF BELLEVILLE, ILLINOIS, Defendant–Appellee.**

No. 94–3699.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1995.

Reargued Feb. 23, 1996.

Decided July 17, 1997.*

---

* This case was originally argued on April 10, 1995 before a panel that included Judges Manion and Rovner as well as Judge Hubert L. Will of the Northern District of Illinois, sitting by designa-

tion. Regrettably, Judge Will died while the case was under advisement. Judge Ripple was assigned at random to take his place on the panel, and the case was reheard on February 23, 1996.

Ferne P. Wolf (argued), Carr, Korein, Tillery, Kunin, Montroy & Glass, East St. Louis, IL, for Plaintiffs–Appellants.

Dennis E. Rose, Donovan, Rose, Nester & Szewczyk, Belleville, IL, Douglas Heise (argued), Wirth & Heise, Belleville, IL, for Defendant–Appellee.

Before RIPPLE, MANION and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Twin brothers J. and H. Doe[1] took summer jobs with the City of Belleville, Illinois. They quit after two months, fed up with the unrelenting harassment to which they had been subjected by their male co-workers. By their parents, they subsequently filed suit against the city, contending that they were sexually harassed in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Equal Protection Clause of the Fourteenth Amendment, and that they were constructively discharged in retaliation for protesting the harassment. The district court granted summary judgment in favor of Belleville, reasoning principally that because both the Does and their harassers were heterosexual males, the plaintiffs could not show that they were harassed "because of" their sex. We conclude that sexual harassment of a man by other men is actionable under Title VII and that the evidence in this case, construed in the Does' favor, permits the inference that they were harassed because of their sex. The fact that the Does' harassers are not gay—a fact that some courts view as dispositive—is, in our view, immaterial. Consequently, although we affirm the entry of summary judgment in Belleville's favor on the plaintiffs' retaliation claim, we reverse the grant of summary judgment on their Title VII and Fourteenth Amendment claims of sex discrimination and remand for a trial on those claims.

I.

For purposes of summary judgment, the city has not disputed the plaintiffs' account of what occurred during their employment. We are, in any event, bound to credit the plaintiffs' version of events at this juncture. *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 656 (7th Cir.1991) (en banc). We therefore accept the following facts as true.

J. and H. Doe were sixteen years old when they were hired by the City of Belleville in 1992 to cut weeds and grass in the municipal cemetery. From the first, both young men were subjected to a relentless campaign of harassment by their male coworkers. For the ostensible purpose of differentiating between the brothers, the other men (all of whom were significantly older than the plaintiffs) nicknamed J., who apparently was overweight, the "fat boy" and dubbed H., who wore an earring, the "fag" or the "queer."

---

**1.** We use the pseudonyms in view of the plaintiffs' youth and the sensitive nature of their allegations.

Day in and day out, both brothers were subjected to such ridicule, but it was H. who was the main target of the daily verbal abuse, most of which was served up by co-worker Jeff Dawe. Dawe, a former Marine of imposing stature, constantly referred to H. as "queer" and "fag" and urged H. to "go back to San Francisco with the rest of the queers." Dawe also repeatedly inquired of H., "Are you a boy or a girl?" Dawe soon took to calling H. his "bitch" and said that he was going to take him "out to the woods" and "get [him] up the ass." Dawe regularly made these sorts of remarks in the presence of other co-workers, who joined in the harassment with derogatory remarks of their own. On one occasion, for example, Dave Harris encouraged Dawe to take H. out and "get a piece of that young ass." Like Dawe, Stan Goodwin, the plaintiffs' supervisor, referred to H. as a "queer" or "fag" because H. wore an earring. Once, in reference to Dawe's repeated announcement that he planned to take H. "out to the woods" for sexual purposes, Goodwin asked Dawe whether H. was "tight or loose," "would he scream or what?"

For the most part, the co-workers spared J. from these sorts of taunts, content to deride him as the "fat boy." One day, however, after H. contracted a case of poison ivy on his arms, chest, and crotch, Dawe inquired of J. in graphic terms whether H. had passed along his own case of poison ivy to J. through anal sex. Before J. could respond, Goodwin and Harris chimed in that if that were the case, then Dawe must have contracted a rash as well, since he was always taking H. "out to the woods."

The verbal taunting of H. turned physical one day when Harris, noting that H. was in ill humor, told Dawe that his "bitch" appeared to be grumpy and urged Dawe to do something about it. Dawe, who had just returned from a lunch that included a few drinks at a local tavern, walked toward H. saying, "I'm going to finally find out if you are a girl or a guy." H. stepped backward in an attempt to avoid Dawe, but found himself trapped against a wall. Dawe proceeded to grab H. by the testicles and, having done so, announced to the assemblage of co-workers

present, "Well, I guess he's a guy." In his deposition, H. testified that following this episode he came to believe that Dawe was actually willing and able to take him out to the woods and sexually assault him.

Following the crotch-grabbing incident, both brothers decided they had had enough and resolved to quit their jobs before the end of the summer. They did not disclose any of these events to their parents, although they did reveal their desire to resign. Their parents suggested that if they did not like their jobs, they should at least give their employer two weeks' notice; hence, the following day, they told Goodwin they would be leaving in a fortnight. The Does did not disclose their actual reason for quitting; instead, fearing reprisals and further taunting if that reason were known, H. and J. concocted a story that they had gotten into some sort of trouble at home and that their father was sending them away to Oklahoma as punishment. But the Does confided in friend and fellow city employee Bonnie Boeving that they really were leaving because of the constant taunting to which they had been subjected on the job; and prior to their intended date of departure, the Does' co-workers learned through the grapevine that the Does were not bound for Oklahoma. Having discovered the deception, their co-workers subjected the Does to even more abuse, culminating in a firecracker being thrown near H., where it exploded. With two days left in their final two weeks of employment, H. and J. immediately left work and never returned.

After filing charges with the EEOC and receiving their right-to-sue letters, the Does filed suit against Belleville claiming that they had been sexually harassed and ultimately (based on the firecracker incident) discharged constructively in retaliation for protesting their mistreatment to Boeving, in violation of Title VII. They further alleged that the harassment amounted to intentional sex discrimination in violation of the Fourteenth Amendment's Equal Protection Clause.

The district court granted summary judgment in favor of the city on all of the plaintiffs' claims. In the court's view, the plaintiffs had not come forward with evidence

supporting the notion that they were discriminated against on the basis of their sex:

> The plaintiffs worked in an all male environment. Both Plaintiffs are white, heterosexual males. The employees responsible for the comments and actions are also white heterosexual males. The comments made and the actions taken did not serve to discriminate against the Plaintiffs because they were male, but rather, these actions and comments implied that the Plaintiffs were homosexual. Title VII does not afford protection [from] this type of conduct.

Order at 3–4; *see Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1084 (7th Cir.1984) ("Congress manifested an intention to exclude homosexuals from Title VII coverage."), *cert. denied*, 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985). Moreover, the court noted, the evidence suggested that neither plaintiff had construed the actions of his co-workers as sexual harassment, for when asked at their depositions whether their co-workers had "made a sexual advance" toward either of them, "asked for sexual favors," asked to "have sex" with them, or had physical contact with them "of a sexual nature," both J. and H. had responded "no." *E.g.*, H. Dep. 29; J. Dep. 40; *see* Order at 4–5. Because the evidence was thus insufficient to establish sexual harassment cognizable under Title VII, the court reasoned, there could be no viable claim for retaliation, nor could there be a Fourteenth Amendment claim that the plaintiffs were deprived of equal protection. Order at 5–6.

## II.

■ This case was decided below on summary judgment, which is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the district court's decision de novo, of course (*e.g., Sybron Transition*

*Corp. v. Security Ins. Co. of Hartford*, 107 F.3d 1250, 1254 (7th Cir.1997)), construing the evidence and any inferences that reasonably may be drawn from it in the light most favorable to the parties opposing summary judgment, in this case J. and H. Doe (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). If, upon review of the record, we find that a reasonable factfinder might find in favor of the Does, then we must reverse the grant of summary judgment and remand for trial. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283 (7th Cir. 1996).

We conclude that H. Doe is entitled to a trial on his Title VII and Fourteenth Amendment claims of sexual harassment. On any given work day, H. was faced with the prospect of having his gender questioned ("Are you a boy or a girl?"), having a co-worker, Jeff Dawe, repeat his threat to assault H. sexually ("I'm going to take you out in the woods and give it to you up your ass"), often with the encouragement of others (who urged Dawe to "get a piece of that young ass" and asked if H. was "tight or loose" and "would he scream or what?"), and, ultimately, having his testicles grabbed in a proclaimed effort to determine once and for all whether he was male or female ("Well, I guess he's a guy."). If H. were a woman, no court would have any difficulty construing such abusive conduct as sexual harassment. And if the harassment were triggered by that woman's decision to wear overalls and a flannel shirt to work, for example—something her harassers might perceive to be masculine just as they apparently perceived H.'s decision to wear an earring to be feminine—the court would have all the confirmation that it needed that the harassment indeed amounted to discrimination on the basis of sex.[2] The fact that H. is male changes the analysis not at all, as we

---

2. *Compare Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 902 (11th Cir.1988) (per curiam) (saleswoman derided as "bitch" and "whore" by male co-workers, who also remarked

that "[w]e're going to take your pants off and put a skirt on you," and "we're going to take your clothes off to see if you are real").

explain below. We believe, then, that there is more than enough evidence that would permit the factfinder to conclude that his workplace was made hostile because of his sex.

Our focus throughout this opinion largely will be on H., rather than J. Doe. The harassment to which the parties have devoted most of their attention is the conduct targeted specifically at him, and we believe it is that harassment that most vividly illustrates why same-sex harassment is actionable as sex discrimination. Like his brother, J. was the object of considerable harassment himself. The sexual nature of this harassment is less evident from the record before us than the harassment that H. Doe endured. Yet, the parties and the district court alike have addressed the Does' claims collectively, and the city in particular has made no meaningful effort to distinguish J. Doe's claims from his brother's. J. Doe is therefore entitled to a trial on his statutory and constitutional claims of sex discrimination as well.

We affirm the entry of summary judgment on the Does' Title VII retaliation claim, however. The evidence does not suggest that the brothers' coworkers drove them from their jobs because they had complained of their mistreatment to another city employee.

### III.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e–2(a)(1). In 1986, the Supreme Court held for the first time that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). The Court embraced the Equal Employment Opportunity Commission's position that "sexual harassment," described as " '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature' " (*id.* at 65, 106 S.Ct. at 2404, quoting 29 C.F.R.

§ 1604.11(a) (1985)), constitutes a form of sex discrimination (*id.* at 66–67, 106 S.Ct. at 2405). It also rejected the notion that such harassment must be linked to an economic quid pro quo in order to be actionable. *Id.* at 64–65, 106 S.Ct. at 2404–05. So long as the harassment complained of is sufficiently severe or pervasive " 'to alter the conditions of [the victim's] employment and create an abusive working environment,' " it affects a "term, condition, or privilege" of employment and thus runs afoul of the statute. *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). Harassment based on race, religion, and national origin had been recognized as the basis for Title VII "hostile environment" claims, the Court noted; so too should harassment based on sex. *Id.* at 66, 106 S.Ct. at 2405. " 'Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.' " *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson*, 682 F.2d at 902). More recently, in *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Court reaffirmed its holding in *Meritor* and clarified that a plaintiff need not prove a psychological injury in order to recover for sexual harassment in the workplace; "[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." *Id.* at 22, 114 S.Ct. at 371 (citation omitted).

Given that sexual harassment is actionable under Title VII as a form of sex discrimination, courts typically speak of the threshold question presented by a sexual harassment claim as being whether the plaintiff was harassed "because of" her sex. *See Harris*, 510 U.S. at 22, 114 S.Ct. at 371 ("Title VII's broad rule of workplace equality" is offended when "the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees *because* of their race, gender, religion or national origin") (emphasis supplied); *Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir.1996); *Carr v. Allison Gas*

*Turbine Div., Gen. Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir.1994); *Rennie v. Dalton,* 3 F.3d 1100, 1107 (7th Cir.1993), *cert. denied,* 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994); *Swanson v. Elmhurst Chrysler Plymouth, Inc.,* 882 F.2d 1235, 1238 (7th Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 774 (1990); *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.,* 755 F.2d 599, 604 (7th Cir.1985). We frame the question in this manner because "Title VII is not directed against unpleasantness per se but only ... against discrimination in the conditions of employment"; thus it is not any and all harassment that is actionable under Title VII, but (for our purposes here) only harassment that is in some way linked to the plaintiff's sex. *Carr,* 32 F.3d at 1009.

The requirement of a nexus between the harassment and the plaintiff's gender gives rise to two questions that we confront here. First, as a matter of law, can a man ever establish that he was harassed "because of" his sex in violation of Title VII, when the harassment he complains of was inflicted by another man? The district court, citing the Fifth Circuit's opinion in *Garcia v. Elf Atochem North America,* 28 F.3d 446, 451–52 (5th Cir.1994), suggested not (Order at 4), and Belleville likewise relies on *Garcia* to argue that same-sex sexual harassment is not actionable under Title VII as a matter of law. Second, if sexual harassment of a male by another male is actionable under Title VII, must the plaintiff offer proof, beyond the explicitly sexual nature of the harassment, that his gender motivated the harasser and that a similarly situated female worker would not have been harassed? In particular, must the plaintiff prove that his harasser was sexually oriented toward the same gender?

### A. Does Title VII reach same-sex harassment?

Of course, "[t]he lion's share of sexual harassment situations features the man as the harasser and the woman as the harassee." *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1353 (7th Cir. 1995); *see also* Martha Chamallas, Essay, *Writing About Sexual Harassment: A Guide to the Literature,* 4 U.C.L.A. WOMEN'S L.J. 37, 38 n. 3 (1993) (discussing EEOC statistics); Susan Perissinotto Woodhouse, Comment, *Same–Gender Sexual Harassment: Is It Sex Discrimination Under Title VII?,* 36 SANTA CLARA L.REV. 1147, 1148 (1996) (same). But Title VII on its face draws no distinction between men and women, either as plaintiffs or harassers, and the EEOC describes sexual harassment in gender-neutral terms.[3] The Supreme Court, in interpreting the statute, has never indicated that women alone may bring sexual harassment claims or that men may do so only when they are harassed by women. *See, e.g., Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. We ourselves have noted (albeit in dicta) that although "[s]exual harassment of women by men is the most common kind, ... we do not mean to exclude the possibility that sexual harassment of men by women, or men by other men, or women by other women would not also be actionable in appropriate cases." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995); *see also McDonnell v. Cisneros,* 84 F.3d 256, 260 (7th Cir.1996) ("a difference in sex is not a necessary condition of sexual activity and hence (most courts think) of sexual harassment").[4] *Accord Barnes v. Costle,* 561 F.2d 983, 990 n. 55 (D.C.Cir.1977); *Bundy v. Jackson,* 641 F.2d 934, 942 n. 7 (D.C.Cir.1981); *Tomkins v. Public Serv. Elec. & Gas Co.,* 568 F.2d 1044, 1047 n. 4 (3d Cir.1977); *Wrightson v. Pizza*

**3.** The relevant EEOC guideline states:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreason-

ably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

29 C.F.R. § 1604.11(a) (1996).

**4.** *Cf. Johnson v. Phelan,* 69 F.3d 144, 147 (7th Cir.1995) ("a prisoner has a remedy for deliberate harassment, on account of sex, by guards of either sex"), *cert. denied,* —— U.S. ——, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996).

*Hut of America, Inc.,* 99 F.3d 138, 142–43 (4th Cir.1996); *Yeary v. Goodwill Indus.-Knoxville, Inc.,* 107 F.3d 443, 447–48 (6th Cir.1997); *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376 n. 4, 1377, 1379 (8th Cir.1996); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); *Fredette v. BVP Management Assocs.,* 112 F.3d 1503 (11th Cir.1997); *see also Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 148 (2d Cir.1993) (Van Graafeiland, J., concurring) ("harassment is harassment regardless of whether it is caused by a member of the same or opposite sex"), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *Morgan v. Massachusetts Gen. Hosp.,* 901 F.2d 186, 192–93 (1st Cir.1990) (assuming without discussion that male on male harassment is actionable under Title VII); *Purrington v. University of Utah,* 996 F.2d 1025, 1028–31 (10th Cir.1993) (same).

A minority of courts nonetheless have concluded that a man harassed by another man has no claim under Title VII, regardless of the scenario. The only appellate court to so hold is the Fifth Circuit. *Garcia v. Elf Atochem, N.A., supra,* 28 F.3d at 451–52, *followed as binding precedent by Oncale v. Sundowner Offshore Servs., Inc.,* 83 F.3d 118 (5th Cir.1996), *cert. granted,* — U.S. —, 117 S.Ct. 2430, 138 L.Ed.2d 192 (1997). *Garcia,* unfortunately, is rather cryptic about the reasons for its holding. Quoting from a prior, unpublished order of the Fifth Circuit, the court merely proclaims: " 'Harassment by a male supervisor against a male subordinate does not state a claim under Title VII even though the harassment has sexual overtones. Title VII addresses gender discrimination.' " 28 F.3d at 451–52 (quoting *Giddens v. Shell Oil Co.,* No. 92–8533, 12 F.3d 208 (5th Cir. Dec.6, 1993) (unpublished), *cert. denied,* 513 U.S. 925, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994)). The court did, however, cite with approval Judge Williams' opinion in *Goluszek v. H.P. Smith,* 697 F.Supp. 1452 (N.D.Ill.1988), which is the leading case in this school of thought.

The plaintiff in *Goluszek* was an unmarried male worker who came from an "unsophisti-cated background," had led an "isolated existence" with "little or no sexual experience," and "blushe[d] easily." His male co-workers urged him incessantly in graphic terms to get married or allow himself to be "fixed up" with women so that he might have sex, showed him pictures of nude women, accused him of being gay or bisexual, and poked him in the buttocks with a stick. The evidence suggested that although his employer took seriously allegations that a female employee had been harassed, its response to Goluszek's complaints was lackadaisical and ineffective. Nonetheless, the court concluded that "the defendant's conduct was not the type of conduct Congress intended to sanction when it enacted Title VII." *Id.* at 1456.

The discrimination Congress was concerned about when it enacted Title VII is one stemming from an imbalance of power and an abuse of that imbalance by the powerful which results in discrimination against a discrete and vulnerable group. Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII,* 97 HARV. L.REV. 1449, 1451–52 (1984). Title VII does not make all forms of harassment actionable, nor does it even make all forms of verbal harassment with sexual overtones actionable. The "sexual harassment" that is actionable under Title VII "is the exploitation of a powerful position to impose sexual demands or pressures on an unwilling but less powerful person." *Id.* at 1451. Actionable sexual harassment fosters a sense of degradation in the victim by attacking their [sic] sexuality. Id. at 1455. In effect, the offender is saying by words or actions that the victim is inferior because of the victim's sex. *Cf. Scott v. Sears, Roebuck & Co.,* 798 F.2d 210, 213 (7th Cir.1986) ("Such severe harassment becomes discriminatory because it deprives the victim (usually female) of the right to participate in the workplace on equal footing with others similarly situated.").

697 F.Supp. at 1456. Goluszek, the court pointed out, "was a male in a male-dominated environment," and the harassment of which he complained was perpetrated by other men. *Id.* Consequently, the notion that he might have worked in an environment that treated men as inferior was simply implausi-

ble. *Id.* "In fact, Goluszek may have been harassed 'because' he is a male, but that harassment was not of a kind which created an anti-male environment in the workplace." *Id.* Although the facts before the court in *Goluszek* described only one form of male on male harassment (*see Quick,* 90 F.3d at 1377, 1378–79, describing the range), other courts (including the Fifth Circuit in *Garcia*) have either approved or relied upon *Goluszek's* rationale in finding *all* manifestations of male on male sexual harassment—including a gay supervisor's harassment of a male subordinate—not to be actionable under Title VII. *See, e.g., Torres v. National Precision Blanking, Div. of Nat'l Mat'l L.P.,* 943 F.Supp. 952 (N.D.Ill.1996), and *Schoiber v. Emro Mktg. Co.,* 941 F.Supp. 730 (N.D.Ill. 1996) (Norgle, J.); *Larry v. North Mississippi Med. Ctr.,* 940 F.Supp. 960, 962–64 (N.D.Miss.1996); *Ashworth v. Roundup Co.,* 897 F.Supp. 489, 492–94 (W.D.Wash.1995); *Sarff v. Continental Express,* 894 F.Supp. 1076, 1082 (S.D.Tex.1995), *aff'd. without published op.,* 85 F.3d 624 (5th Cir.1996); *Myers v. City of El Paso,* 874 F.Supp. 1546, 1548 (W.D.Tex.1995); *Fleenor v. Hewitt Soap Co.,* 67 Fair Empl. Prac. Cas. (BNA) 1625, 1995 WL 386793, *2–*3 (S.D.Ohio Dec.21, 1994), *aff'd. on other grounds,* 81 F.3d 48 (6th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 170, 136 L.Ed.2d 112 (1996); *Vandeventer v. Wabash Nat'l Corp.,* 867 F.Supp. 790, 796 (N.D.Ind. 1994) (Sharp, C.J.), *modified on reconsideration,* 887 F.Supp. 1178, 1180–81 (N.D.Ind. 1995);[5] *see also Dillon v. Frank,* 58 Fair Empl. Prac. Cas. (BNA) 90, 1990 WL 358586, *5–6 (E.D.Mich.1990), *aff'd. in an unpublished op.,* 952 F.2d 403 (6th Cir.1992) (text in Westlaw); *Pasqua v. Metropolitan Life Ins. Co.,* 1995 WL 683772, *4 (N.D.Ill. Nov.16, 1995) (Kocoras, J.), *aff'd. on other grounds,* 101 F.3d 514, 517 (7th Cir.1996). Belleville relies on this line of authority in defending the judgment below.

Although we agree with *Goluszek* that the historic imbalance of power between men and women in the workplace offers a very compelling reason why the sexual harassment of a woman by a male superior or co-worker should be understood as sex discrimination,[6] we cannot agree that Title VII excludes from its purview men who are sexually harassed by other men. The language of Title VII, as we have already noted, does not purport to limit who may bring suit based on the sex of either the harasser or the person harassed.

As for congressional intent, the legislative history suggests that legislators had very little preconceived notion of what types of sex discrimination they were dealing with when they enacted Title VII. We noted in *Ulane v. Eastern Airlines, supra,* that sex was added to the list of prohibited grounds of discrimination by a congressional opponent at the last moment in the hopes that it would dissuade his colleagues from approving the bill; it did not. 742 F.2d at 1085; *see also Meritor,* 477 U.S. at 63–64, 106 S.Ct. at 2404; Christopher W. Deering, Comment, *Same–Gender Sexual Harassment: A Need to Reexamine the Legal Underpinnings of Title VII's Ban on Discrimination "Because Of" Sex,* 27 CUMB. L.REV. 231, 268–69 (1996–97). Against this backdrop, we were confident that Congress had nothing more than the traditional notion of "sex" in mind when it voted to outlaw sex discrimination, and that discrimination on the basis of sexual orientation and transsexualism, for example, did not fall within the purview of Title VII. *Ulane,* 742 F.2d at 1085–86. But to attribute to Congress an intent solely to strike at sexual harassment reflecting the historic exploitation of women by their male co-workers reads far too much into a legislative history that amounts to little more than a last-ditch effort to scuttle the entire statute. Moreover, the degree to which Congress was concerned with the barriers to equality that women encounter in the workplace "does not create 'a negative inference' limiting the scope of the Act to the specific problem that motivated its enactment." *Newport News*

---

5. Chief Judge Sharp retreated from his initial conclusion in *Vandeventer* that same-sex harassment is not actionable under Title VII based on our opinion in *Baskerville. See also Blozis v. Mike Raisor Ford, Inc.,* 896 F.Supp. 805 (N.D.Ind.1995).

6. *See McDonnell,* 84 F.3d at 260 ("sexual harassment is a source of substantial nonpecuniary costs to many working women"); *Scott v. Sears, Roebuck & Co.,* 798 F.2d at 213.

*Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 679, 103 S.Ct. 2622, 2629, 77 L.Ed.2d 89 (1983).[7]

It is, ultimately, the plain, unambiguous language of the statute upon which we must focus. *E.g., Reves v. Ernst & Young,* 507 U.S. 170, 177, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993) ("If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.") (internal quotation marks and citations omitted); *Time Warner Cable v. Doyle,* 66 F.3d 867, 876 (7th Cir. 1995) ("the plain language of the statute is the most reliable indicator of congressional intent"), *cert. denied,* —— U.S. ——, 116 S.Ct. 974, 133 L.Ed.2d 894 (1996). There is no ambiguity here. As we noted at the outset of this discussion, the words of Title VII suggest that anyone discriminated against "because of" such individual's sex may bring suit, regardless of his gender or that of his harasser. The facial breadth of the statute has led our colleagues in the Fourth, the Sixth, the Eighth, and the Eleventh Circuits, and in district courts within and without this Circuit to conclude that same-sex harassment claims are viable under Title VII. *Wrightson v. Pizza Hut of America, Inc., supra,* 99 F.3d at 141–43; *Yeary v. Goodwill Indus. Knoxville, Inc.,* 107 F.3d at 447–48; *Quick v. Donaldson Co., supra,* 90 F.3d at 1376–80;[8] *Fredette v. BVP Management Assocs., supra,* 112 F.3d at 1506; *Mil-*

*ler v. Vesta, Inc.,* 946 F.Supp. 697, 701–05 (E.D.Wis.1996) (Stadtmueller, C.J.); *Johnson v. Hondo, Inc.,* 940 F.Supp. 1403, 1409 (E.D.Wis.1996) (Warren, J.); *Peric v. Board of Trustees of Univ. of Illinois,* 68 Empl. Prac. Dec. para. 44,265, 1996 WL 515175, *2–*3 (N.D.Ill. Sep.6, 1996) (Conlon, J.); *Shermer v. Illinois Dep't of Transp.,* 937 F.Supp. 781 (C.D.Ill.1996) (Mills, J.) (assuming without deciding); *Kaplan v. Dacomed Corp.,* 1996 WL 89148 (N.D.Ill. Feb. 27, 1996) (Shadur, J.); *Ton v. Information Resources, Inc.,* 70 Fair Empl. Prac. Cas. (BNA) 355, 1996 WL 5322, at *5–7 (N.D.Ill. Jan. 3, 1996) (Leinenweber, J.); *Boyd v. Vonnahmen,* 66 Empl. Prac. Dec. para. 43,620, 1995 WL 420040, *2–3 (S.D.Ill. Mar. 29, 1995) (Gilbert, C.J.); *Blozis v. Mike Raisor Ford, Inc.,* 896 F.Supp. 805, 806–07 (N.D.Ind.1995) (Sharp, C.J.); *Griffith v. Keystone Steel & Wire, Div. of Keystone Consol. Indus., Inc.,* 887 F.Supp. 1133, 1136–37 (C.D.Ill.1995) (Mihm, C.J.); *Wright v. Methodist Youth Servs., Inc.,* 511 F.Supp. 307, 310 (N.D.Ill.1981) (Shadur, J.); *Barlow v. Northwestern Mem. Hosp.,* 67 Empl. Prac. Dec. para. 43,831, 1980 WL 128728, *1 (N.D.Ill. July 14, 1980) (Marovitz, J.); *Parrish v. Washington Nat'l Ins. Co.,* 1990 WL 165611, *7 n. 2 (N.D.Ill. Oct.16, 1990) (Bobrick, M.J.); *see also, e.g., Caldwell v. KFC Corp.,* 958 F.Supp. 962, 967–69 (D.N.J.1997); *McCoy v. Macon Water Authority,* 966 F.Supp. 1209, 1217–18 (M.D.Ga. 1997); *Wiley v. Burger King,* 69 Empl. Prac. Dec. para. 44,379, 1996 WL 648455 (E.D.Pa.

**7.** *See Easton v. Crossland Mortg. Corp.,* 905 F.Supp. 1368, 1380 (C.D.Cal.1995) ("While there is no doubt [t]hat Congress enacted Title VII's gender provisions in order to balance the inequities, or worse, in the workplace that women were forced to endure by their male supervisors, it should be equally without question that Title VII's broad prohibitions forbid any individual, regardless of gender, who has the power to control the terms and conditions of another's employment [to] wield that power in a manner which discriminates against that employee because of his or her sex.") (emphasis in original), *rev'd on other grounds,* 114 F.3d 979 (9th Cir. 1997) (per curiam).

**8.** In *Quick,* the Eighth Circuit did not expressly confront the question, as the defendant did not argue that same-sex harassment claims are not actionable under Title VII. *See* 90 F.3d at 1376 n. 4. Instead, the defendant argued "that harassment between heterosexual males is not action-

able under Title VII unless the plaintiff can show an anti-male work environment," as the district court itself had concluded. *Id.* at 1376. The majority went on to reject that argument and remand the case for trial. That disposition, coupled with the court's emphasis on the broad range of harassment that Title VII reaches (*see id.* at 1377, 1378–79), strongly suggests that the Eighth Circuit indeed does consider same-sex harassment claims to be actionable under the statute. In fact, the court subsequently held in *Kinman v. Omaha Public School Dist.,* 94 F.3d 463, 468 (8th Cir.1996), that same-sex harassment is actionable under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a), and in so doing cited *Quick* as holding the same under Title VII. *See* 94 F.3d at 468; *see also Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 1997 WL 349026, *2 (8th Cir. June 26, 1997).

Nov. 7, 1996); *Wehrle v. Office Depot, Inc.,* 954 F.Supp. 234, 236 (W.D.Ok.1996); *Gerd v. United Parcel Serv., Inc.,* 934 F.Supp. 357, 360–61 (D.Colo.1996); *Tietgen v. Brown's Westminster Motors, Inc.,* 921 F.Supp. 1495, 1502–03 (E.D.Va.1996); *Swage v. Inn Philadelphia,* 68 Empl. Prac. Dec. para. 44,153, 1996 WL 368316, *2–3 (E.D.Pa. June 21, 1996); *Johnson v. Community Nursing Servs.,* 932 F.Supp. 269, 272–73 (D.Utah 1996); *Waag v. Thomas Pontiac, Buick, GMC, Inc.,* 930 F.Supp. 393, 400–03 (D.Minn. 1996); *Williams v. District of Columbia,* 916 F.Supp. 1, 7–10 (D.D.C.1996); *Sardinia v. Dellwood Foods, Inc.,* 67 Empl. Prac. Dec. para. 43,784, 1995 WL 640502, *5–6 (S.D.N.Y. Nov. 1, 1995), *interlocutory appeal certified,* 69 Fair. Empl. Prac. Cas. (BNA) 705, 1995 WL 710205 (S.D.N.Y. Dec. 1, 1995); *King v. M.R. Brown, Inc.,* 911 F.Supp. 161, 166–68 (E.D.Pa.1995); *Easton v. Crossland Mortg. Corp.,* 905 F.Supp. 1368, 1378–80 (C.D.Cal. 1995), *rev'd on other grounds,* 114 F.3d 979 (9th Cir.1997) (per curiam); *Raney v. District of Columbia,* 892 F.Supp. 283, 286–88 (D.D.C.1995); *Nogueras v. University of Puerto Rico,* 890 F.Supp. 60, 62–63 (D.P.R. 1995); *EEOC v. Walden Book Co.,* 885 F.Supp. 1100, 1102–04 (M.D.Tenn.1995); *Prescott v. Independent Life & Accident Ins. Co.,* 878 F.Supp. 1545, 1549–51 (M.D.Ala. 1995); *Joyner v. AAA Cooper Transp.,* 597 F.Supp. 537, 541, 542 (M.D.Ala.1983), *aff'd. without published op.,* 749 F.2d 732 (11th Cir.1984). Consistent with this view, the Supreme Court has interpreted Title VII to prohibit discrimination against members of any statutorily protected group, " *'minority or majority.'* " *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 279, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976) (quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)) (emphasis in *McDonald* ). Put another way, Title VII "protect[s] persons, not classes," as we noted recently. *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158 (7th Cir.1996) (per curiam); *see also Newport News,* 462 U.S. at 682, 103 S.Ct. at 2630 ("Male as well as female employees are protected against

discrimination [under Title VII]").[9] *Cf. Melnychenko v. 84 Lumber Co.,* 424 Mass. 285, 676 N.E.2d 45, 47–48 (1997) (interpreting Massachusetts statute proscribing sexual harassment to reach same-sex harassment perpetrated by heterosexual person); *Zalewski v. Overlook Hosp.,* 300 N.J.Super. 202, 692 A.2d 131 (N.J.Super.L.1996) (finding New Jersey anti-discrimination statute to reach same-sex harassment perpetrated on male perceived to be a virgin and effeminate); *Cummings v. Koehnen,* 556 N.W.2d 586, 589 (Minn.App.1996), *review granted* (Minn. Feb. 26, 1997) (finding sexual harassment actionable under Minnesota Human Rights Act regardless of gender or sexual orientation of either victim or harasser), *affirmed,* 568 N.W.2d 418 (Minn.1997).

We therefore reject the narrow construction of Title VII advanced by *Goluszek, Garcia,* and their progeny. Unless we read into the statute limitations that have no foundation in the broad, gender-neutral language that Congress employed, it is evident that anyone sexually harassed can pursue a claim under Title VII, no matter what her gender or that of her harasser.

## B. What evidence is required to show that same-sex harassment has occurred "because of" the plaintiff's sex?

Title VII bars an employer from discriminating against an employee because of her sex (42 U.S.C. § 2000e–2(a)(1)), and thus, as we noted above, courts typically require a plaintiff complaining of sex discrimination, including sexual harassment, to demonstrate that the discrimination occurred "because of" her gender. *E.g., Pasqua,* 101 F.3d at 517. This requirement has not detained courts long in cases of opposite-sex harassment; it is generally taken as a given that when a female employee is harassed in explicitly sexual ways by a male worker or workers, she has been discriminated against "because of" her sex. *E.g., Horn v. Duke Homes, supra,* 755 F.2d at 604. But courts by and large have been unwilling to make the same assumption when a man harasses another man

**9.** *See also* 2 EEOC Compliance Manual § 615.2 (victim and harasser need not be of different genders).

in the workplace, however rife the harassment may be with sexual innuendo, sexual contact, and other conduct of an explicitly sexual nature. *E.g., McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1195–96 & n. 5 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 752 (4th Cir.) (opinion of Niemeyer, J.), *cert. denied,* —— U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996). They have looked instead for proof, above and beyond the sexual content of the harassment itself, that the plaintiff was singled out for harassment because of his gender. *Id.*

One may reasonably infer from the evidence before us that H. Doe was harassed "because of" his gender. If that cannot be inferred from the sexual character of the harassment itself, it can be inferred from the harassers' evident belief that in wearing an earring, H. Doe did not conform to male standards. Thus the repeated inquiries as to whether he was "a guy or a girl," for example. The fact that none of the harassers is gay does not defeat the claim of sexual harassment, as the district court believed. Although we have no quarrel with the notion that same-sex, sexual harassment perpetrated by a gay or lesbian individual amounts to sex discrimination, we do not agree that same-sex, sexual harassment is actionable under Title VII only when the harasser is sexually oriented toward members of his or her own gender. We have never made the viability of sexual harassment claims dependent upon the sexual orientation of the harasser, and we are convinced that it would be both unwise and improper to begin doing so. Fears that if such a requirement is not imposed, commonplace "horseplay" will give rise to sexual harassment claims are, we believe, unfounded. Sexual harassment law already provides the means for distinguishing between isolated instances of non-severe harassment and the truly hostile working environment.

The divergent answers courts have given to the question of when same-sex harassment constitutes sex discrimination necessitates that we spend some time addressing each of these points below. But we do not wish the length of our analysis to detract from what we believe to be the straightforward nature of this case. As we observed at the outset, if H. were a woman, there would be no agonizing over whether the harassment the plaintiffs have described could be understood as sex discrimination. The happenstance that he is instead male should not make for an entirely different analysis, particularly for purposes of a statute that forbids sex discrimination.

## 1.

The need for proof that the plaintiff was targeted for harassment because of his gender is evident in cases where the harassment is not explicitly sexual (the type of harassment the EEOC cites in its guideline (*see* n. 3, *supra*)), but is gender-based nevertheless. Harassment can obviously take many forms, and although mere profanity, "shoptalk," and other manifestations of "general unpleasantness" in the workplace typically will not by themselves support a Title VII claim (*Carr,* 32 F.3d at 1009, 1010), harassment lacking in sexual overtones may nonetheless support a claim for sex discrimination when it is visited upon workers of one gender but not the other. This is typically referred to as "gender harassment." *See* 3 Lex K. Larson, EMPLOYMENT DISCRIMINATION § 46.01[3] (2d ed.1995). Thus, "*any* harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII" (*McKinney v. Dole,* 765 F.2d 1129, 1138 (D.C.Cir.1985) (emphasis supplied); *see also Carson,* 82 F.3d at 158–59); and hostile environment claims are "in no way limited ... to intimidation or ridicule of an explicitly sexual nature" (*Andrews v. City of Philadelphia,* 895 F.2d 1469, 1485 (3d Cir.1990)). *See also Carr,* 32 F.3d at 1010; *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993); *Hall v. Gus Construction Co.,* 842 F.2d 1010, 1014 (8th Cir.1988); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987); *Bell v. Crackin Good Bakers, Inc.,* 777 F.2d 1497, 1503 (11th Cir.1985); *Curde v. Xytel Corp.,* 912 F.Supp. 335, 340 (N.D.Ill.1995). A wom-

an employed in a male-dominated workplace with an antipathy toward female workers might find her tools constantly missing, her locker broken into, and her work sabotaged, for example, as part of a campaign of harassment motivated by her gender yet devoid of sexual innuendo and contact. In such a case, the plaintiff necessarily must show differential treatment of men and women, or an animus to her own gender, in view of the fact that the harassment itself does not suggest a nexus to the plaintiff's gender. *See Spain v. Gallegos,* 26 F.3d 439, 447, 449 (3d Cir.1994); *Vore v. Indiana Bell Tel. Co.,* 32 F.3d 1161, 1164 (7th Cir.1994); *Cline v. General Elec. Credit Auto Lease, Inc.,* 748 F.Supp. 650, 654–55 (N.D.Ill.1990); Carrie N. Baker, Comment, *Proposed Title IX Guidelines on Sex–Based Harassment of Students,* 43 EMORY L.J. 271, 316–17 (1994).

█ It is not clear why such proof is needed when the harassment has explicit sexual overtones, however. Arguably, the content of that harassment in and of itself demonstrates the nexus to the plaintiff's gender that Title VII requires. Thus, the Third Circuit has remarked that "[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course." *Andrews,* 895 F.2d at 1482 n. 3; *see also Nichols v. Frank,* 42 F.3d 503, 511 (9th Cir.1994) (opinion of Reinhardt, J.) ("[S]exual harassment is *ordinarily* based on sex. What else could it be based on?") (emphasis in original); *Jones v. Flagship Int'l,* 793 F.2d 714, 720 n. 5 (5th Cir.1986) ("Except in the exceedingly atypical case of a bisexual supervisor, it should be clear that sexual harassment is discrimination based on sex."), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987) (quoting *Henson v. City of Dundee, supra,* 682 F.2d at 905 n. 11); *Jones v. Aspin,* 64 Empl. Prac. Dec. para. 43,005, 1994 WL 88988, at *1 n. 1 (E.D.Pa. Mar. 1, 1994); *Frey v. Pennsylvania Airlines,* 859 F.Supp. 137, 144 (M.D.Pa.1992); *Cline,* 748 F.Supp. at 654. And as the district court observed in *Cline:*

Sexual harassment cases differ because the discriminatory nature of the charged conduct speaks for itself. The main issue in sexual harassment cases is not whether the employer harassed the employee on the basis of her gender, but whether the claimed harassment affected the terms, conditions, or privileges of the plaintiff's employment, as Title VII uses those words.

*Id.; accord Katz v. Dole,* 709 F.2d 251, 255 (4th Cir.1983) ("In cases involving claims of sexual harassment, . . . the sexual advance or insult almost always will represent 'an intentional assault on an individual's innermost privacy.' Therefore, once the plaintiff in such a case proves that harassment took place, the most difficult legal question typically will concern the responsibility of the employer for the harassment.") (quoting *Bundy v. Jackson, supra,* 641 F.2d at 945); *see also Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1083 (3d Cir.1996) (reasonable jury could find that intent to discriminate is implicit in use of racial code words) (citing, *inter alia, Futrell v. J.I. Case,* 38 F.3d 342, 347 (7th Cir.1994) (age bias could be inferred from remarks that company needed "sharp young people" and that plaintiff was not a "forward enough thinker")); *Vore,* 32 F.3d at 1164 (racially hostile remarks, graffiti, and other conduct are indicative of "obvious" animus). This view is consistent with the EEOC's guideline, which does not focus on whether the harasser singled out the victim on the basis of her gender, but instead provides simply that "verbal or physical conduct of a sexual nature constitute[s] sexual harassment when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." 29 C.F.R. § 1604.11(a) (quoted in full at n. 3, *supra*).

The harassment of which H. Doe complains, although certainly disagreeable, does not fall into the category of "general unpleasantness" or generic "shoptalk." It was targeted specifically at H. and it was explicitly sexual—it both revolved around his gender *and* specifically alluded to sexual conduct. From his first day at work, H. was repeated-

ly referred to as a "bitch" (sometimes as Dawe's "bitch") [10] and asked whether he was "a boy or a girl"; was threatened with a trip "out to the woods" where Dawe would "get him up the ass"; and, last but not least, he was backed up to a wall and his testicles grabbed so that Dawe might "finally find out if [H. is] a girl or a guy." In view of the overt references to H.'s gender and the repeated allusions to sexual assault, it would appear unnecessary to require any further proof that H.'s gender had something to do with this harassment; the acts speak for themselves in that regard.[11]

But some cases can be read to suggest that even the explicitly sexual nature of the harassment is not enough to establish that the harassment was *discriminatory* for purposes of Title VII. Sexual harassment traditionally has been explained as sex discrimination by pointing out that the harassed plaintiff is subjected to treatment that members of the other gender are not. *See, e.g., Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (" 'Sexual harassment which creates a hostile or offensive environment for members of *one* sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality.' ") (quoting *Henson,* 682 F.2d at 902) (emphasis supplied); *Harris,* 510 U.S. at 25, 114 S.Ct. at 372 (Ginsburg, J., concurring) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."); *Rabidue v. Osceola Refining Co., Div. of Texas–American Petrochemicals, Inc.,* 805 F.2d 611, 620 (6th Cir.1986) ("to prove a claim of abusive work environment premised on sexual harassment, a plaintiff

must demonstrate that she would not have been the object of harassment but for her sex"), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *Henson,* 682 F.2d at 904 ("In proving a claim for a hostile work environment due to sexual harassment . . ., the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment"); *Bundy,* 641 F.2d at 942 n. 7 ("the question is one of but-for causation: would the complaining employee have suffered the harassment had he or she been of a different gender"); *Blozis,* 896 F.Supp. at 806–07. The familiar notion is thus that a woman sexually harassed by a man may claim discrimination under Title VII because the harasser is, presumably, heterosexual and would not have bothered her if she were a man. *See, e.g., Horn,* 755 F.2d at 604 ("But for Horn's womanhood, [her supervisor] would not have demanded sex as a condition of employment."). In the same way, a gay man who sexually harasses a male co-worker "discriminates" because he presumably has no interest in treating a female coworker in the same way. *See Barnes,* 561 F.2d at 990 & n. 55; *Peric,* 1996 WL 515175, at *3; *Raney,* 892 F.Supp. at 288; *Nogueras,* 890 F.Supp. at 63; *Walden Book Co.,* 885 F.Supp. at 1103–04; *Prescott,* 878 F.Supp. at 1550–51; *Joyner,* 597 F.Supp. at 542; *Wright,* 511 F.Supp. at 309–10.

Yet, we must question whether it is appropriate to view sexual harassment as actionable sex discrimination only when the plaintiff is able to show that she was harassed because she was a woman *rather than* a man, or vice versa. Proof that the harasser was motivated to target (or in practice did target) one gender and not the other may be neces-

---

**10.** *See* L. Camille Hèbert, *Sexual Harassment is Gender Harassment,* 43 U. KAN. L.REV. 565, 574 (1995) ("Sexual epithets often directed at women, such as 'cunt' and 'bitch,' clearly reflect the gender-based nature of the animus that motivates them."); *Reynolds v. Atlantic City Convention Center Auth.,* 53 Fair Empl. Prac. Cas. (BNA) 1852, 1864–65, 1990 WL 267417, *15 (D.N.J. May 26, 1990) ("Quite clearly, but for the fact that plaintiff is a woman, she would not have been called 'cunt' or 'douche bag cunt.' "), *aff'd. without published op.,* 925 F.2d 419 (3d Cir. 1991); *see Steiner v. Showboat Operating Co., supra,* 25 F.3d at 1464; *see also Galloway v.*

*General Motors Serv. Parts Operations,* 78 F.3d 1164, 1167–68 (7th Cir.1996) (noting that although "bitch" is not inevitably a gender-related term, it may be depending on the context).

**11.** *Cf. McDonnell v. Cisneros,* 84 F.3d at 259–60 ("Unfounded accusations that a woman worker is a 'whore,' a siren, carrying on with her coworkers, a Circe, 'sleeping her way to the top,' and so forth are capable of making the workplace unbearable for the woman verbally so harassed, and since these are accusations based on the fact that she is a woman, they could constitute a form of sexual harassment.").

sary where the harassment is not on its face sexual, as we have discussed, but such proof would seem unnecessary when the harassment itself is imbued with sexual overtones. Recall that the premise of the hostile environment claim (which is what the Does are asserting) is that the conditions of the plaintiff's work environment have been altered in a way that made the *environment* hostile to him or her as a man or woman. *E.g., Harris,* 510 U.S. at 22, 114 S.Ct. at 371 (Title VII is violated when "the discriminatory conduct was so severe or pervasive that it created a *work environment* abusive to employees because of their race, gender, religion, or national origin") (emphasis supplied); *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1454–55 (7th Cir.1994) ("the test under Title VII is ... whether working conditions have been discriminatorily altered") (citations omitted); *see* Pamela J. Papish, *Homosexual Harassment or Heterosexual Horseplay? The False Dichotomy of Same–Sex Sexual Harassment Law,* 28 COLUM. HUM. RTS. L.REV. 201, 232–33 (1996), Regina L. Stone-Harris, Comment, *Same–Sex Sexual Harassment—The Next Step in the Evolution of Sexual Harassment Law Under Title VII,* 28 ST. MARY'S L.J. 269, 295–97 (1996); Deering, *supra,* 27 CUMB. L.REV. at 289–90. Thus, so long as the environment itself is hostile to the plaintiff because of her sex, why the harassment was perpetrated (sexual interest? misogyny? personal vendetta? misguided humor? boredom?) is beside the point. If H. and J. were twin brother and sister, for example, it would not be permissible for their co-workers to pervasively refer to J. as "the chick," to grab her breasts, and to threaten to undress and assault her ostensibly to tell the two of them apart. Whatever the reason she were harassed in this way, the work environment would be rendered hostile to J. *as a woman.* For it is one thing to berate a female worker as "worthless"; although derogatory, the term on its face is gender neutral, and a hostile environment claim founded upon that type of generic harassment typically would require proof that women were belittled while men were not. But, as the Ninth Circuit has recognized, it is quite another "to call her 'a worthless broad,'" *Steiner v. Showboat Operating Co., supra,* 25 F.3d at 1464, to berate her with terms like "bitch" and "cunt." See Katherine M. Franke, *The Central Mistake of Sex Discrimination Law: The Disaggregation of Sex From Gender,* 144 U. PA. L.REV. 1, 90–92 (1995).

When the harasser sets out to harass a female employee using names, threats, and physical contact that are unmistakably gender-based, he ensures that the work environment becomes hostile to her as a woman—in other words, that the workplace is hostile to her "because of" her sex. Regardless of why the harasser has targeted the woman, her gender has become inextricably intertwined with the harassment. Likewise, when a woman's breasts are grabbed or when her buttocks are pinched, the harassment necessarily is linked to her gender. *See Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 861 n. 15 (3d Cir.1990) (" '[w]omen's sexuality largely defines women as women in this society, so violations of it are abuses of women as women' ") (quoting Catherine A. MacKinnon, SEXUAL HARASSMENT OF WORKING WOMEN: A CASE OF SEX DISCRIMINATION 174 (1979)). It would not seem to matter that the harasser might simultaneously be harassing a male co-worker with comparable epithets and comparable physical molestation. When a male employee's testicles are grabbed, his torment might be comparable, but the point is that he experiences that harassment as a man, not just as a worker, and she as a woman. In each case, the victim's gender not only supplies the lexicon of the harassment, it affects how he or she will experience that harassment; and in anything short of a truly unisex society, men's and women's experiences will be different.[12] In that sense, each arguably is the victim of sex discrimination. See *Steiner,* 25 F.3d at 1464 ("Even if [the harasser] used sexual epithets equal in intensity and in an equally degrading manner against male employees, he cannot thereby 'cure' his conduct toward women.... [A]lthough words from a man to a man are differently received than words from a man to a woman,

---

**12.** A man typically would not be offended to be described as "macho," for example, but a wom-

an might well be. *See Andrews,* 895 F.2d at 1485–86.

we do not rule out the possibility that *both* men and women working at Showboat have viable claims ... for sexual harassment.") (emphasis in original); *see also Miller v. Vesta, supra,* 946 F.Supp. at 706.

Looked at in another light, the explicitly sexual harassment of a female worker amounts to sex discrimination in violation of Title VII not simply because her harasser might be heterosexual, and thus would not be sexually interested in a man, and not simply because a man might not encounter comparable harassment in the workplace, but because her employment is now conditioned upon her willingness to endure harassment that is inseparable from her gender. *See Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee, supra,* 682 F.2d at 902); *Drinkwater v. Union Carbide Corp., supra,* 904 F.2d at 859–60. When she is taunted day after day in sexual terms, told she will be taken into a back room for sexual purposes, and has her breasts grabbed to determine whether she is "a boy or a girl," she is no longer an employee but a sexual object, judged not by how well she does her job but by how she measures against the sexual standards of her co-workers. *Id.* at 861 n. 15. From her point of view, and from the perspective of any reasonable person, the harasser's motives are immaterial. Perhaps the harasser is sexually attracted to her, perhaps he just wants her job and figures that harassing her sexually would be the most effective way of driving her from it; either way, the environment is hostile, and the hostility is inescapably and irrevocably linked to her gender.

The same is true of racial harassment, for example. If an African American is repeatedly subjected to racial slurs and talk of lynching by his co-workers, we typically do not ask, "But was he singled out because of his race?" *See, e.g., Daniels v. Essex Group, Inc.,* 937 F.2d 1264 (7th Cir.1991); *Hunter v. Allis–Chalmers Corp., Engine Div.,* 797 F.2d 1417 (7th Cir.1986). Perhaps intuitively, we understand that the harassment, perpetrated through the vehicle of race, is discriminatory and injurious in and of itself, even if his harassers wanted to make his life miserable for reasons altogether unrelated to the color of his skin. *See* Frantz Fanon, *The Fact of Blackness* in THE ANATOMY OF RACISM 108–11 (David Theo Goldberg, ed., 1990); *see also, e.g., Daniels,* 937 F.2d at 1273 & n. 3, 1274 & n. 4; *Steiner,* 25 F.3d at 1464; *Aman v. Cort Furniture Rental Corp., supra,* 85 F.3d at 1083.[13] With that understanding in mind, it is not difficult to imagine an abusive supervisor simultaneously harassing several subordinates of different racial and ethnic backgrounds, but in each instance choosing an epithet, symbol, or gesture that he surely knows will have a uniquely hurtful and intimidating impact upon its intended target. Perhaps he paints a swastika on the locker of a Jewish employee, while he threatens a worker of Japanese ancestry with internment. The discrimination in that scenario

---

**13.** Our dissenting colleague suggests that although it is reasonable to infer that harassment of this nature is discrimination because of the target's race when the perpetrators are white, for example, it would not be reasonable to draw the same inference if both the target and the perpetrators were African American. *Post* at 604. But we have recognized elsewhere in the discrimination context that the plaintiff is not barred from asserting racial discrimination simply because the person whom she contends was responsible for the discriminatory action was of the same race. *Carson v. Bethlehem Steel Corp., supra,* 82 F.3d at 158. Judge Moran has also remarked on this point in the context of a termination decision:

The defendant maintains that plaintiff has no claim of sex discrimination because the firing decision was made by another woman and her replacement was also female. This position reflects a misunderstanding of the laws against

discrimination and the evils they were enacted to combat. The fact that a woman fired a woman or a black fired another black does not demonstrate that the supervisor's decision was free of the racial and gender stereotyping that federal law attempts to remove from employers' decisionmaking.

*Veatch v. Northwestern Mem. Hosp.,* 730 F.Supp. 809, 817 (N.D.Ill.1990) (record citation omitted). For the same reasons, we cannot agree that a work environment that on its face is racially hostile to the plaintiff does not, as a matter of law, constitute discrimination "because of" the plaintiff's race simply because the acts of harassment were perpetrated by individuals of the same race as the plaintiff. Although that scenario may not fit comfortably within our preconceived notions of racial harassment, the context of the harassment may nonetheless support the inference that the plaintiff was discriminated against "because of" his race.

lies not in the selection of victims (which might be random) but in the decision to perpetrate the harassment through words and conduct charged with unmistakable racial, religious, and ethnic overtones, creating a work environment that is uniquely hostile to each victim because of his particular race, religion, or ethnicity. *See* Steven S. Locke, *The Equal Opportunity Harasser As a Paradigm for Recognizing Sexual Harassment of Homosexuals Under Title VII*, 27 RUTGERS L.J. 383, 413–14 (1996).

Just so here. We doubt that it would have mattered for H. Doe to know, when his testicles were in Dawe's grasp, that Dawe was heterosexual or (as his deposition reveals) that he lived with a woman (Dawe Dep. 51–52), and thus that he may not have been sexually interested in H. The experience was still humiliating in a deeply personal way, as only sexual acts can be. *See Katz v. Dole, supra,* 709 F.2d at 254; *Bennett v. Corroon & Black Corp.,* 845 F.2d 104, 106 (5th Cir. 1988), *cert. denied,* 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989); Catherine A. MacKinnon, ONLY WORDS 60 (1993). It may not have been an "overt sexual advance" in the sense that it reflected a desire to have sex with H. *See post* at 598–599. But aside from being unwelcome, it was a grave intrusion upon H.'s sexual privacy and, given the remarks that accompanied the assault, an explicit comment upon his gender. Frankly, we find it hard to think of a situation in which someone intentionally grabs another's testicles for reasons entirely unrelated to that person's gender. But the overall context of the harassment alleged in this case— the name-calling, the references to sexual assault, and the intrusive, intimate touching, all of which expressly invoked H.'s gender— certainly makes it reasonable to infer that the workplace was made hostile to him because of his gender. And to the extent that their mind-set is pertinent, we also think that one can reasonably infer that Dawe and his cohorts chose to harass H. in the way that they did with just this likelihood in mind— that is, that their intent was to humiliate him as a man.

We view with considerable skepticism, therefore, the notion that same-sex harassment that is overtly sexual and sex-based is only sex discrimination when the plaintiff can produce proof that the harasser chose him specifically because he is male. Again, we have difficulty imagining when harassment of this kind would *not* be, in some measure, "because of" the harassee's sex—when one's genitals are grabbed, when one is denigrated in gender-specific language, and when one is threatened with sexual assault, it would seem to us impossible to de-link the harassment from the gender of the individual harassed. We need not so decide, however, because there is more linking the harassment to the plaintiff's gender here.

2.

 Assuming *arguendo* that proof other than the explicit sexual character of the harassment is indeed necessary to establish that same-sex harassment qualifies as sex discrimination, the fact that H. Doe apparently was singled out for this abuse because the way in which he projected the sexual aspect of his personality (and by that we mean his gender) did not conform to his coworkers' view of appropriate masculine behavior supplies that proof here. The Supreme Court's decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), makes clear that Title VII does not permit an employee to be treated adversely because his or her appearance or conduct does not conform to stereotypical gender roles. *Price Waterhouse* was a case in which the parties were at odds over whether Ann Hopkins was denied a partnership in an accounting firm based on an illegitimate criterion—sex—or a legitimate one-interpersonal skills. Hopkins pointed to the firm's reliance upon gender stereotypes as evidence that sex was the motivating factor in the decision: her reviews asserted that she was "macho," "over-compensated for being a woman," needed "a course at charm school," and was "a lady using foul language" (*id.* at 235, 109 S.Ct. at 1782); moreover, when a partner explained the adverse vote to Hopkins, he advised her that she ought to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry" in order to brighten her prospects for making partner in

the future (*id.* at 235, 109 S.Ct. at 1782). Six members of the Court agreed that this evidence bespoke gender discrimination and as such was sufficient to shift the burden to the defendant to show that it would have denied Hopkins the promotion even had it not relied on sex in determining her suitability for admission to the partnership.[14] In no uncertain terms, the plurality firmly rejected Price Waterhouse's suggestion that such stereotyping was irrelevant to Hopkins' Title VII claim:

> [W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for " '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.' " *Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 707, n. 13, 98 S.Ct. 1370, 1375, n. 13, 55 L.Ed.2d 657 (1978), quoting *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (C.A.7 1971).

490 U.S. at 251, 109 S.Ct. at 1791. (Neither Justice White, nor Justice O'Connor, each of whom concurred in the judgment, had any quarrel with that proposition.)

■ Just as the accounting firm's reliance upon gender stereotypes informed the Court's decision in *Price Waterhouse* that Ann Hopkins had presented sufficient proof that she was denied a partnership because of her sex and not some other factor, evidence that the same stereotypes animated H. Doe's co-workers suggests that the harassment they perpetrated on him was "because of" his sex. A woman who is harassed in the workplace with the degree of severity or pervasiveness that our cases require [15] because her personality, her figure, her clothing, her hairstyle, or her decision not to wear jewelry or cosmetics is perceived as unacceptably "masculine" is harassed "because of" her sex even

if the harassment itself is not explicitly sexual. *See supra* at 575–576. In the same way, a man who is harassed because his voice is soft, his physique is slight, his hair is long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed "because of" his sex. Read favorably to the plaintiffs, the testimony here suggests that H. Doe was harassed (in an explicitly *sexual* fashion, we reiterate) in whole or in part because he wore an earring, a fact that evidently suggested to his co-workers that he was a "girl" or, in their more vulgar view, a "bitch." *Cf. post* at 598 (reasoning that discharge of male receptionist by male supervisor who believes it more appropriate for women to greet customers amounts to sex discrimination); *Hines v. Caston School Corp.,* 651 N.E.2d 330, 334 (Ind. Ct.App.1995) (school board's ban on male students wearing earrings defended as a policy that "creates discipline, a sense of pride, and positive attitudes among students because it discourages rebellion against local community standards of dress, under which earrings are considered female attire"). Just as in *Price Waterhouse,* then, gender stereotyping establishes the link to the plaintiff's sex that Title VII requires. The contexts of the two cases are admittedly different, but the differences are immaterial. The question in both cases is whether a particular action (in *Price Waterhouse,* the exclusion from partnership, here, the harassment by co-workers) can be attributed to sex; reliance upon stereotypical notions about how men and women should appear and behave (in *Price Waterhouse,* by the partners, here, by H. Doe's tormentors) reasonably suggests that the answer to that question is yes. *See Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1522–23 (M.D.Fla.1991). One need only consider for a moment whether H.'s gender would have been questioned for wearing an earring (*see post* at 601, 607)

---

**14.** *Price Waterhouse* has been statutorily overruled to the extent that a plaintiff can now prevail under Title VII so long as the illicit criterion (here, sex) was a "motivating factor" in the complained of adverse treatment. 42 U.S.C. § 2000e–2(m); *see Pilditch v. Board of Educ. of*

*City of Chicago,* 3 F.3d 1113, 1118 n. 2 (7th Cir.1993), *cert. denied,* 510 U.S. 1116, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994).

**15.** *See, e.g., McKenzie v. Illinois Dep't of Transp.,* 92 F.3d 473, 479–80 (7th Cir.1996).

if he were a woman rather than a man. It seems an obvious inference to us that it would not. *Cf. Huddleston v. Roger Dean Chevrolet, supra* n. 2, 845 F.2d at 902 (female employee's decision to wear pants prompted male co-workers to remark "[w]e're going to take your pants off and put a skirt on you," and "we're going to take your clothes off to see if you are real").[16] (Of course, this is ultimately for the factfinder to resolve; we are merely considering what inferences one may reasonably draw from the evidence before us.)

The city maintains that this case cannot be fit within the *Price Waterhouse* framework because "[t]he type of stereotyping actionable under *Price Waterhouse* is that of traditionally perceived personality traits, not personal appearance or physical traits." Belleville Br. at 8. That is simply wrong. *Price Waterhouse* itself recognizes that gender discrimination may manifest itself in the employer's stereotypical notions as to how an employee of a given gender should dress and present herself. Ann Hopkins was, after all, told that she might improve her chances for partnership if she would only "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 490 U.S. at 235, 109 S.Ct. at 1782. The plurality found such remarks to be highly probative of actionable sex stereotyping (*id.* at 251, 109 S.Ct. at 1791), noting that "it [does not] require expertise in psychology to know that, if an employee's flawed 'interpersonal skills' can be corrected by a soft-hued suit or a new shade of lipstick, perhaps it is the employee's sex and not her interpersonal skills

that has drawn the criticism" (*id.* at 256, 109 S.Ct. at 1793); *see also id.* at 272, 109 S.Ct. at 1802 (O'Connor, J., concurring). We ourselves recognized ten years in advance of *Price Waterhouse* that workplace dress codes founded on cultural stereotypes are not permissible under Title VII. *Carroll v. Talman Fed. Sav. & Loan Ass'n of Chicago*, 604 F.2d 1028 (7th Cir.1979) (invalidating rule requiring female but not male employees to wear bank-approved uniforms), *cert. denied*, 445 U.S. 929, 100 S.Ct. 1316, 63 L.Ed.2d 762 (1980).

It is true, as Belleville reminds us, that courts have afforded employers a certain amount of latitude to adopt employee grooming standards that are not entirely gender neutral. *See, e.g., DeSantis v. Pacific Tel. & Tel. Co.*, 608 F.2d 327, 332 (9th Cir.1979) (discharge of male nursery school teacher because he was perceived as effeminate for wearing earring beyond purview of Title VII)[17]; *cf. Rathert v. Village of Peotone*, 903 F.2d 510 (7th Cir.), *cert. denied*, 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990) (rejecting due process and First Amendment claims of male police officers disciplined for wearing earrings while off duty). But these cases are entirely inapposite here. H. Doe is not suing Belleville in order to challenge a workplace rule that forbade him from wearing an earring. The city had no such rule.[18] H. instead points to the earring, and his co-workers' apparent belief that an earring is a feminine accoutrement not suitable for male adornment, as evidence that his gender had something to do with the harassment heaped upon him. To the extent that proof of such a

---

16. *See* Papish, *supra*, 28 Colum. Hum Rts. L.Rev. at 226 ("Harassment of men who do not conform to gender norms, like the plaintiff in *Goluszek*, serves to enforce proscribed notions of gender in the workplace."); Franke, *supra*, 144 U. Pa. L.Rev. at 9596; Stone–Harris, *supra*, 28 St Mary's L.J. at 304–05; Dale Carpenter, *Same–Sex Sexual Harassment Under Title VII*, 37 S. Tex. L.Rev. 699, 723–24 (1996); Kara L. Gross, Note, *Toward Gender Equality and Understanding: Recognizing That Same–Sex Sexual Harassment Is Sex Discrimination*, 62 Brooklyn L.Rev. 1165, 1201–03, 1205–06 (1996); Sandra Levitsky, Note, *Footnote 55: Closing the "Bisexual Defense" Loophole in Title VII Sexual Harassment Cases*, 80 Minn L.Rev. 1013, 1042 (1996); Mary Ann C. Case, *Disaggregating Gender from Sex and*

*Sexual Orientation: The Effeminate Man in the Law and Feminist Jurisprudence*, 105 Yale L.J. 1, 33, 46–49 (1995).

17. The extent to which *DeSantis* survives *Price Waterhouse* is a question we need not address.

18. Even assuming that Belleville did have a rule prohibiting men from wearing earrings and that it would survive scrutiny under Title VII, such a rule would not be license for the harassment of which H. complains. *See Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir.1994) ("An employer could never have a legitimate reason for creating a hostile work environment."); *see also Wallace v. Benware*, 67 F.3d 655, 661–63 (7th Cir.1995).

nexus is required in a case like this one, we see nothing wrong with H.'s theory.

### 3.

The district court seemed to think that because there was no proof that the Does' harassers are gay, the Does could not, as a matter of law, show that they were harassed "because of" their sex. Order at 3–4. It is not alone in that view; a number of courts have suggested that such proof is virtually the *sine qua non* of a same-sex harassment claim under Title VII. *E.g., McWilliams v. Fairfax County Bd. of Supervisors, supra,* 72 F.3d at 1195 & n. 5; *Hopkins v. Baltimore Gas & Elec. Co., supra,* 77 F.3d at 752; *Ward v. Ridley School Dist.,* 940 F.Supp. 810, 812–13 (E.D.Pa.1996); *see also Shermer,* 937 F.Supp. at 784.[19]

### a.

The Fourth Circuit's recent opinions are illustrative of the emphasis on sexual orientation. Although that court has recognized the viability of same-sex harassment claims, it has suggested that the homosexuality of the plaintiff and/or his harassers is an "essential" element of the claim that must be pleaded and proved. *McWilliams v. Fairfax County Board of Supervisors, supra,* 72 F.3d at 1195

& n. 5. Mark McWilliams worked as an automotive mechanic for a county transportation agency. A learning disability had arrested his cognitive and emotional development, and perhaps that is what made him the target of a group of male co-workers known colloquially as the "lube boys." These men repeatedly teased and questioned McWilliams about his sex life, exposed themselves to him, and touched him in sexually suggestive ways. One co-worker made a habit of following McWilliams into the bathroom where, with a hand on the unzipped fly of his pants, he would invite McWilliams into a stall. He also repeatedly asked if he could masturbate McWilliams and on one occasion, while McWilliams was working under the dashboard of a bus, he actually did so, rubbing McWilliams' penis until it became erect. In one of several instances in which McWilliams was blindfolded, his hands were cuffed, and he was forced to his knees, this same co-worker put his finger in McWilliams' mouth and simulated an act of oral sex. In another instance, McWilliams was held down while one co-worker exposed himself and another placed a broom handle between McWilliams' buttocks. On yet another occasion, a condom was placed in McWilliams' food. Ultimately, McWilliams filed suit under Title VII, but

---

19. Other means of demonstrating that same-sex harassment constitutes sex discrimination have been identified. *See Miller v. Vesta, supra,* 946 F.Supp. at 705–06; *Shermer v. Illinois Dep't of Transp., supra,* 937 F.Supp. at 783–84. Two of the avenues frequently cited are (1) showing that the workplace is infected with an anti-male animus (when the plaintiff is male, of course) and (2) establishing disparate treatment of men and women. *See Miller,* 946 F.Supp. at 705–06 (rejecting notion that either is necessary to establish sex discrimination); *Shermer,* 937 F.Supp. at 784. Both are problematic as prerequisites to a sexual harassment claim, as Judge Stadtmueller recognized in *Miller,* and neither one is likely to be of much help to a plaintiff complaining of same-sex sexual harassment. Establishing that same-sex harassment is the result of an animus to the harasser's own gender is a daunting prospect at best. Certainly any harassment of this nature reflects a lack of regard for the person harassed, but it would be difficult to show that this is a gender-based disregard, particularly when one considers that same-sex harassment often occurs in all-male work environments—as in *Goluszek,* for example, and here. Moreover, we have expressly rejected the argument that proof of a gender-based animus is required to

make a claim of sex discrimination. *King v. Board of Regents of Univ. Of Wis. Sys.,* 898 F.2d 533, 539 (7th Cir.1990) ("All that is required is that the action taken be motivated by the gender of the plaintiff. No hatred, no animus, no dislike is required."). Proof of disparate treatment is also elusive in the same-sex context. How is a plaintiff to show disparate treatment if he is the only individual being harassed, for example? And how could he ever hope to show disparate treatment in a work environment populated entirely by men, as the Does' workplace was? *See Shermer,* 937 F.Supp. at 784; *see also Vore v. Indiana Bell Tel. Co.,* 32 F.3d at 1164. We have already alluded to the possibility that persons of either gender might be harassed without that detracting from the gender-linked nature of the harassment. *See supra* at 578–579; *but see Pasqua,* 101 F.3d at 517. Moreover, as Judge Stadtmueller pointed out in *Miller,* an approach which insists that the harassment is actionable under Title VII only when members of one gender alone are harassed is inconsistent with our opinion in *Carson,* which stresses that it is *persons* that Title VII protects, not *classes.* 946 F.Supp. at 706 (citing *Carson,* 82 F.3d at 158); *see also Shermer,* 937 F.Supp. at 784.

the Fourth Circuit held in a divided opinion that the district court had properly entered summary judgment against him on this claim, because "McWilliams and all his alleged harassers were indisputably males, and no claim is made that any was homosexual." *Id.* at 1195. The majority explained:

We believe this result compelled by a commonsense reading of the critical causation language of the statute: "because of the [claimant's] sex." As a purely semantic matter, we do not believe that in common understanding the kind of shameful heterosexual-male-on-heterosexual-male conduct alleged here (nor comparable female-on-female conduct) is considered to be "because of the [target's] '*sex*.'" Perhaps "because of" the victim's known or believed prudery, or shyness, or other form of vulnerability to sexually-focussed speech or conduct. Perhaps "because of" the perpetrators' own sexual perversion, or obsession, or insecurity. Certainly, "because of" their vulgarity and insensitivity and meanness of spirit. But not specifically "because of" the victim's *sex*.

*Id.* at 1195–96 (emphasis in original). Judge Michaels, who dissented, wrote that he was inclined to hold "that Title VII is implicated whenever a person physically abuses a coworker for sexual satisfaction or propositions or pressures a coworker out of sexual interest or desire." *Id.* at 1198. In his view, it was unnecessary for McWilliams to allege or prove that his harassers were homosexual. "The acts of assault and harassment are sufficiently direct and suggestive by themselves to raise the question whether they were done 'because of [McWilliams'] ... sex.'" *Id.* at 1199. The majority explicitly rejected this suggestion, however:

The dissent expresses concern, because of proof (and privacy?) problems about requiring such allegation and proof, but we believe it critical and eminently fair to require it if homosexuality is to be the critical fact making same-sex harassment claims cognizable under Title VII. The (ordinarily different) sexes of the relevant actors always has been an essential element of either form of Title VII sexual harassment claims. If such claims were to reach past different-sex to same-sex situa-

tions where the homosexuality of one or the other or both of the actors is involved, that added fact would seem equally essential to the statement and proof of such a claim.

*Id.* at 1195 n. 5.

More recently, in *Hopkins v. Baltimore Gas & Elec. Co.*, *supra*, Judge Niemeyer, a member of the majority in *McWilliams*, expounded further on why he believed proof of the harasser's sexual orientation is pertinent in a case alleging same-sex harassment. "When someone sexually harasses an individual of the opposite gender," he explained, "a presumption arises that the harassment is 'because of' the victim's gender."

This presumption is grounded on the reality that sexual conduct directed by a man, for example, toward a woman is usually undertaken because the target is female and the same conduct would not have been directed toward another male. *See, e.g., Barnes*, 561 F.2d at 990 (plaintiff "became the target of her superior's sexual desires because she was a woman.... [N]o male employee was susceptible to such an approach"). But when the harasser and the victim are of the same gender, the presumption is just the opposite because such sexually suggestive conduct is usually motivated by entirely different reasons.

Thus, when a male employee seeks to prove that he has been sexually harassed by a person of the same sex, he carries the burden of proving that the harassment was directed against him "because of" his sex. The principal way in which this burden may be met is with proof that the harasser acted out of sexual attraction to the employee. In *McWilliams*, 72 F.3d at 1195 n. 5, we noted that a male employee who undertakes to prove sexual harassment directed at him by another male may use evidence of the harasser's homosexuality to demonstrate that the action was directed at him because he is a man. But we cautioned that proof of such homosexuality must include more than "merely suggestive" conduct. *Id.*

77 F.3d at 752 (opinion of Niemeyer, J.).[20]

Finally, in *Wrightson v. Pizza Hut of America, Inc.*, *supra*, the court addressed the threshold question it had skirted in *McWilliams* and *Hopkins*—whether same-sex harassment is, in fact, actionable under Title VII. (The court had assumed that it was in *McWilliams*, and Judge Niemeyer so argued in *Hopkins*.) Noting that the language of the statute did not rule out same-sex claims, the court concluded that "a same-sex 'hostile work environment' sexual harassment claim may lie under Title VII where a homosexual male (or female) employer discriminates against an employee of the same sex or permits such discrimination against an employee by homosexual employees of the same sex." 99 F.3d at 143. The harassment in *Wrightson* included sexual advances, physical contact, and graphic, sexual remarks; but in addition to the nature of the harassment itself, the plaintiff had alleged that his harassers, who included his male supervisor and certain of his male co-workers, all were homosexual. In view of that allegation, the court concluded that the plaintiff's claim of same-sex harassment was viable under Title VII as a claim of sex discrimination. *Id.* at 143; *see also Yeary v. Goodwill Indus.-Knoxville, Inc.*, *supra*, 107 F.3d at 447–48; *Fredette v. BVP Management Assocs.*, *supra*, 112 F.3d at 1505, 1506–07.

b.

The notion that the harasser's sexual orientation is pertinent stems from the assumption that sexual harassment is a function of the harasser's sexual attraction to the harassee. *E.g.*, *Hopkins*, 77 F.3d at 752 (Niemeyer, J.); *Martin v. Norfolk Southern Ry. Co.*, 926 F.Supp. 1044, 1049–50 (N.D.Ala. 1996). Thus, the heterosexual man who sexually harasses a woman discriminates within the meaning of Title VII because (assuming

he is a zero on the Kinsey scale[21]), he is sexually uninterested in men and so would have no reason to harass a man sexually. To the extent that sexual desire is to some degree the explanation for sexual harassment, we agree that same-sex harassment perpetrated by a gay or lesbian individual is the functional equivalent of opposite-sex harassment perpetrated by a heterosexual individual. In that sense, we have no difficulty agreeing with the Fourth Circuit's conclusion in *Wrightson*, the Sixth Circuit's in *Yeary*, and the Eleventh Circuit's in *Fredette* that an employee who has been subject to sexual overtures and other harassment by a gay coworker of the same gender has a clear-cut claim of sex discrimination under Title VII. *See McDonnell v. Cisneros*, 84 F.3d at 260. But for a number of reasons, we do not agree that the viability of a same-sex harassment claim should be made to depend on the sexual orientation of the harasser.

c.

The Supreme Court's recent decision in *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), and our own subsequent decision in *Carson v. Bethlehem Steel Corp.*, *supra*, 82 F.3d 157, demonstrate that it is ill-advised to make categorical assumptions about which factual scenarios bespeak discrimination and which do not. In *O'Connor*, the Court considered whether a plaintiff attempting to make out a prima facie case of age discrimination under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), had to show that upon his discharge, he was replaced by someone outside the class of persons forty years of age and older protected by the Age Discrimination in Employment Act. In a unanimous

---

20. The other two members of the *Hopkins* panel did not join this portion of Judge Niemeyer's opinion. Judge Niemeyer believed that same-sex harassment is actionable under Title VII, provided the plaintiff can present proof of the type described in the passages we have just quoted. His colleagues, however, believed it unnecessary to decide whether same-sex harassment is indeed actionable under Title VII at all. That question was resolved in *Wrightson, infra.*

21. Based on his study of adult men, Alfred Kinsey devised a seven-point scale to describe the continuum of sexual orientation, with zero representing a male who is exclusively heterosexual in experience and orientation, three representing a bisexual man, and six representing a man who is exclusively homosexual. *See* Alfred C. Kinsey, Ward B. Pomeroy, & Clyde E. Martin, SEXUAL BEHAVIOR IN THE HUMAN MALE 638–55 (1948).

opinion, the Court concluded that he did not. "The fact that one person in the protected class has lost out to another person in the protected class is ... irrelevant," the Court observed, "so long as he has lost out *because of his age.*" — U.S. at ——, 116 S.Ct. at 1310 (emphasis in original). In the effort to distinguish viable from unviable claims of discrimination, the Court admonished, lower courts must take care not to make arbitrary factors part of the prima facie case, for what the prima facie case requires is evidence adequate to create an inference of discrimination. *Id.* Mandating proof that a discharged worker was replaced by someone outside of the protected class failed that requirement, because it would recognize a claim of discrimination when a forty year-old was replaced by a thirty-nine year-old (where the inference of age discrimination is weak or non-existent) but not when a fifty-six year-old is replaced by a forty year-old (where the inference of age discrimination is much stronger). *Id.* Taking our cue from *O'Connor,* we held in *Carson* that simply because a white woman had been discharged by a white supervisor and replaced by another white individual did not bar her from making a case of racial discrimination in violation of Title VII.

> An employee may be able to show that his race or another characteristic the law places off limits tipped the scales against him, without regard to demographic characteristics of his replacement.... The question instead is whether the plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground. That one's replacement is of another race, sex, or age may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition.

82 F.3d at 158–59.

The case before us, obviously, is not a discharge case that the plaintiff has pursued within the framework of *McDonnell Douglas* and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), but at bottom the question confronting us here is the same question raised in *O'Connor* and *Carson:* does the evidence before us permit the inference that the plaintiff was the victim of unlawful discrimination? *O'Connor* and *Carson* make clear that we must not permit the viability of a discrimination claim to turn on arbitrary factors that do not capture the universe of actionable discrimination. We are convinced that the sexual orientation of the person who sexually harasses his co-worker is just such an arbitrary factor.

#### d.

The focus on the sexual orientation of the harasser betrays a fundamental misconception that sexual harassment inevitably is a matter of sexual desire run amok—in other words, that the harasser is attracted to the victim and simply cannot restrain himself. Certainly we agree that sexual harassment *can* spring from the harasser's attraction to the victim. *See Fredette,* 112 F.3d at 1506; *Yeary,* 107 F.3d at 447–48; *Nichols v. Frank, supra,* 42 F.3d at 510 (opinion of Reinhardt, J.). But no case that we are aware of holds that the harasser must have been sexually interested in the victim in order for a claim of sexual harassment to be viable. Take *Dey v. Colt Constr. & Dev. Co., supra,* 28 F.3d 1446, for example. There the male harasser was prone to describe female colleagues in terms like "broad" and "flat chested cunt." He also routinely made sexually charged remarks to and about the plaintiff, suggesting, for example, that Dey had not returned from a vacation to Phoenix with a tan because she spent the week on her back in bed and remarking to someone on the phone that "there is a girl in my office going down on me" as Dey leaned down to place some documents on the floor. On one occasion, while he and Dey were alone in an elevator, he unzipped, and then zipped, his slacks. We found the pattern of such incidents to be strong enough evidence of sexual harassment to require a trial without proof that the harasser was actually attracted to the plaintiff, or even that he was heterosexual. Indeed, we deemed the evidence sufficient to survive summary judgment despite the fact that Dey had never been touched in a sexually suggestive manner (as H. Doe *was*), and despite the fact that it was never intimated to Dey that sex was a *quid pro quo*

for continued employment or promotion within the company. *See id.* at 1450. It was enough that the verbal harassment and the zipper incident were "overtly sexual" and for the most part targeted specifically at Dey (*id.* at 1456), that the abuse "upset and embarrassed her, and made her feel uncomfortable," (*id.* at 1454), and that a reasonable person in Dey's position would likewise have perceived the work environment as "hostile and abusive" (*id.* at 1456). The same was true in *Carr v. Allison Gas Turbine Div., General Motors Corp.,* *supra,* 32 F.3d 1007, where the plaintiff was the target of a series of sexual pranks, where she was routinely denominated by her male co-workers as "whore," "cunt," and "split tail," and where the men made a habit of exposing themselves to her. And again in *Dombeck v. Milwaukee Valve Co.,* 40 F.3d 230 (7th Cir.1994), where the plaintiff was repeatedly referred to as "bitch," where her buttocks were slapped, where her tormentor placed his boot in her crotch and wiggled it, and where he pulled on the elastic band of her slacks and peered at her underwear, we did not think it important whether or not the harasser sexually desired the plaintiff or what his sexual orientation was. It was enough that she and any other reasonable woman would have found the harassment degrading and abusive. In these cases, as in any case of sexual harassment, the pervasive sexual content of the harassment has been all the proof needed to establish that the plaintiff has been *sexually* harassed and thus discriminated against because of her sex.[22]

The Eighth Circuit made just this point recently in *Quick.* In that case the male employees of a muffler production plant had repeatedly "bagged" the plaintiff (grabbed his testicles, or otherwise assaulted his groin) and subjected him to verbal abuse which, incidentally, included the types of homophobic epithets that H. Doe's co-workers favored (more on that below). The district court entered summary judgment in favor of the defendant on his Title VII claim, reasoning in part that the abuse, although it involved the plaintiff's genitals, was not genuinely sexual in nature: "'Bagging' did not happen because male DCI coworkers were demanding sexual favors, were expressing sexual interest, or making sexual comments regarding Quick's gender." *Quick v. Donaldson Co.,* 895 F.Supp. 1288, 1296 (S.D.Iowa.1995). The court of appeals rejected this rationale:

> A worker "need not be propositioned, touched offensively, or harassed by sexual innuendo" in order to have been sexually harassed.... Intimidation and hostility may occur without explicit sexual advances or acts of an explicitly sexual nature. Moreover, physical aggression, violence, or verbal abuse may amount to sexual harassment. The bagging was aimed at Quick's sexual organs, his testicles were squeezed so hard on one occasion that he almost passed out from the pain, he was punched in the neck, and he was verbally taunted with names such as "queer" and "pocket lizard licker." Whether or not these actions, when viewed in the totality of the circumstances, constituted prohibited sexual harassment remains a genuine issue of material fact for trial.

90 F.3d at 1379 (citations omitted). The district court spoke to the same point recently in *Tanner v. Prima Donna Resorts, Inc.:*

---

22. The notion that harassment is only actionable sexual harassment when it can be attributed to the harasser's sexual interest in the victim is reminiscent of the now discredited idea that rape is a sexual act, rather than an act of violence. Today we understand it as the latter. *See, e.g., United States v. Powers,* 59 F.3d 1460, 1465–66 & n. 5 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 784, 133 L.Ed.2d 734 (1996). Thus, a man who has raped a woman could not escape criminal liability simply because he is gay, nor could a man who has raped another man escape liability simply because he is heterosexual. It is, in fact, quite common for a man (whatever his sexual orientation) to be raped by another man,

and the rapist is frequently heterosexual. *See* Steve Pokin, *Rape: When the Victim's A Man,* THE PRESS ENTERPRISE (Riverside, California), Sept. 10, 1995, at D01; Heather Mills, *Male Rape 'Hidden by Crime Statistics,'* THE INDEPENDENT (London), May 29, 1995, at 9. Yet, if we were to adopt the reasoning of the courts that have focused on the sexual orientation of the harasser, then even if H. Doe had actually been raped, as Mechelle Vinson allegedly was (*see Meritor Sav. Bank, FSB v. Vinson, supra,* 477 U.S. at 60, 106 S.Ct. at 2402), he would still have to plead and prove that Dawe is homosexual in order to have a viable claim of sexual harassment under Title VII.

Title VII does not require that sexual harassment be motivated by attraction, only that it be "because of sex"; indeed, harassment, like other forms of victimization, is often motivated by issues of power and control on the part of the harasser, issues not necessarily related to sexual preference.

919 F.Supp. 351, 355 (D.Nev.1996); *accord Miller*, 946 F.Supp. at 705; *Johnson v. Community Nursing Servs., supra*, 932 F.Supp. at 273–74 & n. 8; *see also* Deering, *supra*, 27 CUMB. L.REV. at 289-90; Papish, *supra*, 28 COLUM. HUM. RTS. L.REV. at 229.

e.

The focus on sexual orientation thus signals a departure from opposite-sex harassment cases, which have never made the plaintiff's right to relief dependent on proof that the harasser is heterosexual. Judge Niemeyer's opinion in *Hopkins*, which we quoted from above, offers an explanation for the dichotomy. Again, his point is that "[w]hen someone sexually harasses an individual of the opposite gender, a presumption arises that the harassment is 'because of' the victim's gender." 77 F.3d at 752. That presumption makes it unnecessary for the plaintiff in such a case to offer any proof that her harasser was heterosexual. "But," Judge Niemeyer reasons, "when the harasser and the victim are the same gender, the presumption is just the opposite...." *Id.; see also Quick*, 90 F.3d at 1381 (Nangle, J., dissenting); *Martin*, 926 F.Supp. at 1049–50. *See post* at 601, 606. Thus the requirement that the victim of same-sex harassment offer proof of his harasser's sexual orientation, whereas the victim of opposite-sex harassment is burdened with no such requirement.

It may well be true that we have always *assumed*, in the familiar case of opposite-sex harassment, that the harasser was heterosexual and that his sexual orientation toward the opposite sex in some measure contributed to the harassment. But to imbue that assumption with the legal weight of a *presumption* strikes us as a dramatic step in the evolution of sexual harassment law with troubling implications for claims of opposite-sex harassment and same-sex harassment alike.

Let us assume, for example, that we do (or will from now on) formally presume that when a woman complains of explicit sexual harassment by a man, her harasser was heterosexual and for that reason the harassment occurred "because of" her gender. Is that presumption rebuttable? In other words, could her employer avoid liability by proving that the harasser is gay? Or, to take a more plausible scenario, might the employer rebut the presumption by showing that the harasser was motivated to torment the plaintiff not by her gender but out of revenge, for example, because she won a promotion that he had sought? *See Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 998 (10th Cir.1996) (harassment of female plaintiff began with dispute over apportionment of sales commissions). Or, to borrow a page from *McWilliams*, what if the plaintiff's male co-workers harassed her not out of sexual desire, but because of her "known or believed prudery, or shyness, or other form of vulnerability to sexually-focussed speech or conduct," or perhaps because of their "own sexual perversion, or obsession, or insecurity"? 72 F.3d at 1196. *McWilliams* suggests that these are motivations unrelated to gender; if so, they would presumably defeat not only claims of same-sex harassment, but claims of opposite-sex harassment as well. And yet, opposite-sex cases make clear that the reasons for the harassment are not dispositive. *E.g., Winsor*, 79 F.3d at 1001 (dislike of plaintiff was not a defense to harassment charge: "The fact that plaintiff's abuse was motivated by gender neutral reasons is irrelevant."). Thus, claims of opposite-sex harassment are not rejected because the harassment stemmed from the woman's perceived shyness or prudery, or (as is frequently apparent) the male harasser's sexual perversion, obsession, insecurity, vulgarity, insensitivity, or meanness of spirit. *Cf. McWilliams*, 72 F.3d at 1196. Perhaps these scenarios are recognized as viable claims of sex discrimination because the presumption that the harasser acted "because of" his target's gender is irrebuttable in opposite-sex cases. If that is so, we are hard pressed to discern what beyond the sexual content of the harassment

would support such a presumption. And we are unable to see how can that kind of irrebuttable presumption can be squared with the contrary (albeit rebuttable) presumption that the cases propose to affix to same-sex harassment scenarios.

The presumption that when a man sexually harasses another man (or a woman so harasses another woman), it is not because of sex (*see post* at 601, 605, 606), is even more problematic. The presumption apparently is rebuttable in most cases only by proof that the harasser is gay. *McWilliams*, 72 F.3d at 1195 n. 5. *See post* at 598–599, 605, 605–606.[23] This portends appalling discovery issues. *Ryczek v. Guest Servs., Inc.*, 877 F.Supp. 754, 762 n. 7 (D.D.C.1995); *see McWilliams*, 72 F.3d at 1198 (Michael, J., dissenting). We may safely assume, for example, that an alleged harasser like Dawe typically would not simply stipulate at the outset of his deposition, or in response to an interrogatory, that he is gay. So the plaintiff would certainly be entitled to test Dawe on that subject. And if Dawe had a roommate—male or female—it seems likely that he or she too might be served with a deposition subpoena. Friends and family members, as well, for that matter. And we would not envy judges and juries the task of deciding whether a harasser is gay, straight, bisexual, or something else. Few people are either entirely heterosexual or homosexual in orientation, for example—zeros or sixes on the Kinsey scale. *See* n. 21, *supra.* Many people who are heterosexual have had one or more homosexual experiences in their lives, although that does not make them gay, and likewise many gay and lesbian individuals have had heterosexual experiences.[24] And, although gays and lesbians have experienced marked gains in societal acceptance in this country over the last few decades, there are still many gays and lesbians who remain closeted and would never admit to homosexual impulses. *Cf.* David W. Dunlap, *A Republican Congressman Discloses He Is A Homosexual,* New York Times, Aug. 3, 1996, at A6 (discussing fifty-four year-old congressman who acknowledged his sexual orientation only after extensive "outing" campaign). How is a judge to sort this out, to decide, for example, that there is a triable issue of fact as to the harasser's sexual orientation? How is a jury to be instructed? However familiar we as judges may be with questions of proof, we are, ultimately, Ripple, Manion and Rovner, not Kinsey, Masters and Johnson.

f.

The problematic nature of the notion that sexual harassment is actionable only when the harasser is sexually oriented to the victim's gender becomes even more apparent when one considers the disparate results that follow. It suggests, for example, that if the harasser is bisexual, there could be no liability, for the bisexual person does not "discriminate"—he is sexually oriented toward both sexes, and therefore both men and women might fall prey to sexual harassment in the form of unwelcome sexual advances. *See, e.g., Pasqua*, 101 F.3d at 517.[25] It also sug-

23. Although our dissenting colleague suggests that it is "not reasonable" to infer that same-sex harassment occurs "because of" the plaintiff's sex (*post* at 601, 606), we do not understand him to mean that the inference is unreasonable as a matter of law. For at a minimum, our colleague agrees that this type of harassment is "because of" the plaintiff's sex when the perpetrator is gay and (presumably) sexually attracted to the plaintiff, as was the case in *Wrightson, Yeary,* and *Fredette. Post* at 598–599, 605, 605–606. But we do take Judge Manion to mean that absent some evidence to this effect, the presumption is that the harassment was not "because of" the plaintiff's sex. *See post* at 605.

24. See Joannie M. Schrof & Betsy Wagner, *Sex in America,* U.S. News & World Report, October 17, 1994, at 76, 1994 WL 11126804 (discussing recent sex survey) ("[J]ust 2.8 percent of men and 1.4 percent of women say they are gay. When the question is broader, 10.1 percent of men and 8.6 percent of women either identify themselves as gay, say they have had a sexual experience with someone of the same gender or claim to have some physical attraction to members of the same sex.").

25. In 1985, Robert Bork, then of the D.C. Circuit, singled out this dichotomy in criticizing the "discrimination" model of sexual harassment, joined by then-Judge (now Justice) Scalia and then-Judge (now Whitewater Special Prosecutor) Starr:

It is "discrimination" if a man makes unwanted sexual overtures to a woman, a woman to a man, a man to another man, or a woman to another woman. But this court has twice stat-

gests that a man who makes a habit of harassing female co-workers might insulate his employer from liability (for recall that it is the employer, not the individual harasser, that is held liable under Title VII) by occasionally harassing a male worker sexually, even if he preferred to harass women, a prospect that this court has described as "exceedingly perverse." *McDonnell*, 84 F.3d at 260. It also suggests that the employer of a misogynistic gay man who relentlessly harasses a female employee with vulgar insults and obscene gestures could not be held liable because he would not be interested in having sex with her. It even suggests that an employer might escape liability when a male employee harasses a female employee, so long as down the hall at the same firm a woman is harassing a man (or a gay man is harassing another man); for in that scenario too men as well as women are victims of the harassment and so the work environment, however hostile, is not *discriminatorily* so. Under this model of sexual harassment, therefore, the viability of a sexual harassment claim turns not on the factors that we have regularly relied upon until today—the content (physical and verbal) of the harassment, its gravity, its effect on the plaintiff, and its effect on the reasonable person (*e.g.*,

*McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 479–80 (7th Cir.1996))—but on whether the harasser, by nature, would be sexually interested in only one sex (that of the victim).

## g.

■ We need not immerse ourselves in this quagmire. We have never for a moment, in cases where men have harassed women, entertained the notion that it would be a defense to the claim of sexual harassment to show that the harassers were gay, or at least that they were not sexually attracted to the plaintiff (although that is where this business of presumptions about the sexual orientation of the harasser leads us). See Amy Shahan, Comment, *Determining Whether Title VII Provides a Cause of Action for Same–Sex Sexual Harassment*, 48 Baylor L.Rev. 507, 518 (1996); Locke, *supra*, 27 Rutgers L.J. at 398–401.[26] Men sexually harass women in the workplace for reasons other than sexual desire; but that does not detract either from the sexual content of the harassment or from the uniquely intrusive and denigrating impact sexual harassment has upon the women who experience it. So too, as this case demonstrates, can men be sexually harassed without the

ed that Title VII does *not* prohibit sexual harassment by a "bisexual superior [because] the insistence upon sexual favors would ... apply to male and female employees alike." *Barnes v. Costle*, 561 F.2d at 990 n. 55; *Bundy v. Jackson*, 641 F.2d at 942 n. 7. Thus, this court holds that only the differentiating libido runs afoul of Title VII, and bisexual harassment, however blatant and however offensive and disturbing, is legally permissible.

Had Congress been aiming at sexual harassment, it seems unlikely that a woman would be protected from unwelcome heterosexual or lesbian advances but left unprotected when a bisexual attacks. That bizarre result suggests that Congress was not thinking of individual harassment at all but of discrimination in conditions of employment because of gender. If it is proper to classify harassment as discrimination for Title VII purposes, that decision at least demands adjustment in subsidiary doctrines. *See, e.g., Bundy v. Jackson*, 641 F.2d at 951.

*Vinson v. Taylor*, 760 F.2d 1330, 1333 n. 7 (D.C.Cir.1985) (dissent from the denial of rehearing en banc) (emphasis in original).

It is quite clear, of course, that Judge Bork and his fellow dissenters believed that Title VII did

not reach sexual harassment. We *do not* cite their dissent for that proposition, which the Supreme Court has since rejected definitively. *Meritor*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49. It does, however, highlight the problematic nature of an analysis that focuses myopically on the harasser's choice of victims. *See McDonnell*, 84 F.3d at 260; *Chiapuzio v. BLT Operating Corp.*, 826 F.Supp. 1334, 1337–38 & n. 1 (D.Wyo. 1993); *Ryczek*, 877 F.Supp. at 761–62. That women historically have been, and still are, the principal targets of sexual harassment in the workplace is one reason (probably the most persuasive reason, in fact) why that harassment is properly understood as sex discrimination. But it is not the only reason. Experiences like that of H. Doe teach us that both men and women can be made the victims of sexual harassment, and that the harms they suffer do not depend on the gender of the harasser or his inclination to target one sex or the other.

**26.** *See also Johnson v. Community Nursing Servs.*, *supra*, 932 F.Supp. at 274 ("Title VII makes no distinction based upon sexual orientation; the determinative question is not the orientation of the harasser but whether the sexual harassment would have occurred but for the gender of the victim.").

harassers (so far as we know) acting out of sexual desire. *O'Connor* and *Carson* make clear that we must not burden a plaintiff's discrimination claim with requirements that are inconsistent with the broad range of circumstances that can constitute age, race, and in this case, sex discrimination. We therefore reject the notion that same-sex harassment amounts to sex discrimination under Title VII only when the harasser is proven to be gay or lesbian. Although the harasser's sexual orientation toward the harassee's gender, or his sexual interest in the harassee, can indicate that the harassment occurred "because of" the plaintiff's gender, it is unnecessary for the plaintiff to prove this.

4.

A concern that seems to have motivated a number of courts in refusing to recognize cases of same-sex sexual harassment is that courts will be deluged with complaints stemming from horseplay and rough language among men. In *McWilliams,* for example, the court agreed that the type of harassment the plaintiff had suffered at the hands of the "lube boys" was "utterly despicable," that such harassment might well interfere with one's work performance, and that no employer should tolerate it. 72 F.3d at 1196. Yet, the majority was concerned that "to interpret Title VII to reach that conduct when only heterosexual males are involved as harasser and victim would be to extend this vital statute's protections beyond intentional discrimination 'because of' the offended worker's 'sex' to unmanageably broad protection of the sensibilities of workers simply 'in matters of sex.'" *Id.; see also Martin v. Norfolk Southern R. Co., supra,* 926 F.Supp. at 1049–50.

Interestingly, very similar concerns were expressed when courts rejected the first claims of sexual harassment brought by women in the 1970s. *See, e.g., Corne v. Bausch & Lomb, Inc.,* 390 F.Supp. 161, 163–64 (D.Ariz.1975) ("[A]n outgrowth of holding such activity to be actionable under Title VII would be a potential federal lawsuit every time any employee made amorous and/or sexually oriented advances toward another. The only sure way an employer could avoid such charges would be to have employees who were asexual."), *vacated without published opinion,* 562 F.2d 55 (9th Cir.1977); *Tomkins v. Public Serv. Elec. & Gas Co.,* 422 F.Supp. 553, 557 (D.N.J.1976) ("If the plaintiff's view were to prevail, no superior could, prudently, attempt to open a social dialogue with any subordinate of either sex. An invitation to dinner could become an invitation to a federal lawsuit if a once harmonious relationship turned sour at some later time. And if an inebriated approach by a supervisor to a subordinate at the office Christmas party could form the basis of a federal lawsuit for sex discrimination if a promotion or a raise is later denied to the subordinate, we would need 4,000 federal trial judges instead of some 400."), *rev'd,* 568 F.2d 1044 (3d Cir. 1977).

Here we are, twenty years later, and the sky has not fallen. We are not, it turns out, incapable of distinguishing between the occasional off-color joke, stray remark, or rebuffed proposition, and a work environment that is rendered hostile by severe or pervasive harassment. We are well practiced in examining sexual harassment from the objective viewpoint of the reasonable individual as well as the subjective view of the plaintiff. When a man complains that he has been sexually harassed by another man, then, we know how to distinguish between harassment and "horseplay"; we have been making that very distinction for years in the cases that female plaintiffs have brought.

Our analysis here does not support a Title VII claim whenever sexually-oriented remarks or conduct occur in the workplace. Co-workers may trade a crude joke or boast of their sexual exploits without putting their employer at risk of suit by anyone who happens to overhear their sexually explicit discussions. But it is a different matter when an employee is made the unwilling target of repeated, sexually-charged and gender-based remarks, when he is threatened with sexual assault, and when he is subjected to unwelcome sexual contact. Common sense enables us to distinguish between occasional, undirected vulgarity that would not tend to make the workplace particularly hostile to any man or woman and a campaign of harassment that

highlights an individual's gender, uses his gender to embarrass and intimidate him, and renders the work environment hostile to him because he is a man. *See* Stone–Harris, *supra*, 28 St. Mary's L.J. at 313–14.

### 5.

We perceive no conflict between our holding today and our opinion in *Ulane*, *supra*. *See post* at 599, 600–601. We concluded in *Ulane* that Title VII did not reach the claim of a person discharged because she was a transsexual. In so holding, we emphasized that "sex," for purposes of Title VII, should be construed in a traditional manner:

> The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men.

742 F.2d at 1085. Belleville argues that H.'s theory of sex discrimination exceeds the "traditional" view of the subject we took in *Ulane*. There is a hint of the same rationale in the district court's opinion: by emphasizing that both plaintiffs were males working in an all-male environment (Order at 3–4), the court seemed skeptical that the plaintiffs could prove, consistent with *Ulane*, that they were discriminated against "because they are men." *See also post* at 601, 605–606; *Goluszek*, 697 F.Supp. at 1456; *Quick*, 895 F.Supp. at 1296. Here, for example, the evidence suggests not that H. Doe's co-workers were biased against men per se, but against men who did not conform to their notions of masculinity.

Yet, *Ulane* certainly did not purport to define the universe of actionable sex discrimination. In fact, the district court in that case made no findings supporting the notion that Ulane had been discriminated against because of her gender; instead, the lower court's findings focused exclusively on the discrimination she experienced because she was a transsexual. *See* 742 F.2d at 1087. In other words, the record suggested that her discharge was not triggered by her gender per se, but by her *change* in (anatomical) gender. *Id.* That is what we understand the panel to have meant when it emphasized

that the scope of Title VII is limited to discrimination "against women because they are women and men because they are men." *See Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 664 (9th Cir.1977). Reading *Ulane*, as Belleville does, to require evidence of a gender-based animus—the harasser's dislike of men or women—would be inconsistent with our observation in *King v. Board of Regents of Univ. of Wis. Sys.*, 898 F.2d 533, 539 (7th Cir.1990), that such an animus is not a prerequisite to recovery for sex discrimination.

Moreover, to the extent that the city infers from *Ulane* that harassment stemming from the employee's failure to meet the stereotypical expectations of his gender is not discrimination "against a man because he is a man," it is drawing an inference that is foreclosed by the Supreme Court's subsequent decision in *Price Waterhouse*. Recall that the remarks at issue there did not suggest that the employer believed women as a class were inappropriate candidates for partnership. Rather, they reflected an insistence that female employees conform to traditional views of how women should appear and behave. This is precisely the type of biased thinking to which H. Doe attributes his adverse treatment as Belleville's employee. *See* Kathryn Abrams, *Title VII and the Complex Female Subject*, 92 Mich. L.Rev. 2479, 2516 (1994) (noting that the harassment of men who do not fit neatly within the male stereotype has much in common with the sexual harassment of women); *see also* nn. 16 & 19, *supra*.

### 6.

Nonetheless, Belleville argues, and the district court agreed, that the very content of the remarks made to H. reflects discrimination based on H.'s perceived homosexuality (H. is not in fact gay) rather than his sex. Order at 4; *see post* at 601, 607. The courts have widely agreed that discrimination based on sexual orientation (actual or perceived), as opposed to sex, is beyond the purview of Title VII. *E.g.*, *Ulane*, 742 F.2d at 1084 (collecting cases). And there is indeed an unmistakably homophobic aspect to the harassment inflicted on H., exemplified by the use of epithets like "fag" and "queer,"

and the suggestion that he should "go back to San Francisco." But this certainly does not establish, as a matter of law, that H. was being discriminated against solely on the basis of his perceived sexual orientation, as opposed to his sex. Recall, in the first instance, that H. is not complaining of generic harassment that happens to be animated by gender bias, but explicitly *sexual* harassment. As we have noted above, when someone's gender is questioned on a daily basis, when his co-worker regularly threatens to sexually assault him in the woods, and when his genitals are grabbed for the ostensible purpose of determining his gender, we must question whether it makes a whit of difference why he was singled out for abuse; whether his harassers were motivated by his sex, by his purported sexual orientation, or by some other factor, it would seem that he has been harassed sexually and his gender necessarily implicated. *See Johnson v. Community Nursing Servs., supra,* 932 F.Supp. at 273 ("The fact that sexual preference may influence the sexual harassment should not be reason to diminish, let alone invalidate, the fact that a supervisor discriminated against an employee because of the employee's sex."). In any event, it is not at all uncommon for sexual harassment and other manifestations of sex discrimination to be accompanied by homophobic epithets; one need only browse the federal reporters to see that the two routinely go hand in hand. *See, e.g., Bohen v. City of East Chicago, Ind.,* 799 F.2d 1180, 1183 (7th Cir.1986) (plaintiff was made to endure obscene remarks, allusions to rape, and unwelcome sexual contact; "Bohen's fellow employees were also apparently much amused by implying that Bohen's cool reception to their constant invitations to en-

gage in deviate sexual conduct was evidence of lesbian tendencies"); *Quick,* 90 F.3d at 1375 (male plaintiff, who was subjected to repeated assaults in groin area was also subjected to homophobic verbal abuse: "Male employees placed tags on Quick's forklift and belt loop which referred to a sexual act with a cucumber and stated 'Pocket Lizard Licker' and 'Gay and Proud.' In December 1992, a male co-worker wrote 'queer' on Quick's work identification card."); *see also Volk v. Coler,* 845 F.2d 1422, 1426 (7th Cir.1988); *Thanning v. Gulotta,* 898 F.Supp. 134, 137 (E.D.N.Y.1995); *Sanchez v. City of Miami Beach,* 720 F.Supp. 974, 977–78 & n. 9 (S.D.Fla.1989); cf. *Valadez v. Uncle Julio's of Ill., Inc.,* 895 F.Supp. 1008, 1014 (N.D.Ill. 1995) (rejecting employer's argument that harassment was not actionable under Title VII simply because the harasser "was aroused by the fact that plaintiff is a lesbian").[27]

 In *Ulane,* we acknowledged that although discrimination based on transsexualism is not actionable under Title VII, an individual who is a transsexual may nonetheless bring suit when discriminated against on the basis of his or her sex. 742 F.2d at 1087 (citing *Holloway v. Arthur Andersen & Co.,* 566 F.2d at 664). The same principle would of course apply to a person who is gay or lesbian or who is perceived to be so. See *Vandeventer,* 887 F.Supp. at 1180; *Valadez,* 895 F.Supp. at 1014.[28] Here, juxtaposed alongside of the homophobic epithets that Belleville singles out are other remarks that implicate sex rather than sexual orientation—the references to H. as a "bitch" and Dawe's "bitch," for example, and the inquiries professing confusion as to whether H. was "a girl or a guy." We are therefore in

27. There is, of course, a considerable overlap in the origins of sex discrimination and homophobia, and so it is not surprising that sexist and homophobic epithets often go hand in hand. Indeed, a homophobic epithet like "fag," for example, may be as much of a disparagement of a man's perceived effeminate qualities as it is of his perceived sexual orientation. Observations in this vein have led a number of scholars to conclude that anti-gay bias should, in fact, be understood as a form of sex discrimination. *See, e.g.,* Sylvia A. Law, *Homosexuality and the Social Meaning of Gender,* 1988 Wis. L.Rev. 187 (1988); Marc A. Fajer, *Can Two Real Men Eat Quiche*

*Together? Storytelling, Gender-Role Stereotypes, and Legal Protections for Lesbians and Gay Men,* 46 U. Miami L.Rev. 511, 617–33 (1992). We do not go so far here. We merely take the opportunity to point out that it is not always possible to rigidly compartmentalize the types of bias that these types of epithets represent.

28. Of course, Congress has not, and constitutionally could not, make gays and lesbians, or people perceived to be gay or lesbian, "stranger[s] to its own laws." *Romer v. Evans,* —— U.S. ——, ——, 116 S.Ct. 1620, 1629, 134 L.Ed.2d 855 (1996).

no position at this stage of the proceedings to make a definitive finding as to why H.'s co-workers harassed him. We are instead compelled, in reviewing the grant of summary judgment in favor of Belleville, to afford H. the benefit of any reasonable inferences that may be drawn from the record. *E.g., Perdomo v. Browner,* 67 F.3d 140, 144 (7th Cir. 1995) (noting the "added rigor" with which this principle must be applied in employment discrimination cases); *Hermes v. Hein,* 742 F.2d 350, 354 (7th Cir.1984) (noting that where the evidence permits conflicting inferences as to the defendants' motivation, summary judgment is not appropriate). The possibility that H.'s harassers may have been motivated by more than one type of animus renders this case no different from one in which the employer may have had mixed motives in treating the plaintiff adversely—one motive proscribed by law, another not. The fact that one motive was permissible does not exonerate the employer from liability under Title VII; the employee can still prevail so long as she shows that her sex played a motivating role in the employer's decision. *See* 42 U.S.C. § 2000e-2(m); *see also Price Waterhouse,* 490 U.S. at 241, 109 S.Ct. at 1785 (plurality) ("Title VII [was] meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations"). The same is true here—all that H. need show is that sex was a motivating (not the sole) factor in the harassment. The evidence before us permits that inference, and we cannot just declare that a case is about sexual orientation, rather than sex, simply because homophobia has reared its head along with sexism. *Cf. Nabozny v. Podlesny,* 92 F.3d 446, 454–58 (7th Cir.1996) (gay student whose complaints of harassment by fellow students met with inaction by school officials had viable equal protection claims for discrimination on the basis of gender *and* sexual orientation).

### 7.

■ The district court also found the proof of sexual harassment to be wanting because "[n]either Plaintiff construed the actions [of their coworkers] as unwelcome sexu-

al harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature." Order at 4. That finding is based on an unduly cramped reading of the record, however. It is true of course that in order to establish a viable hostile environment claim, a plaintiff must tender evidence permitting of the inference both that a reasonable person would have perceived the environment as abusive and that he actually experienced it as such. *Harris,* 510 U.S. at 21–22, 114 S.Ct. at 370; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 444 (7th Cir.1994). But the plaintiff's perceptions need not neatly track the EEOC's legal definition of sexual harassment in order to satisfy the subjective component of this inquiry. In this case, for example, H. was asked whether Dawe and the other workers had ever "ma[d]e any sexual advances toward you," whether they "ask[ed] you to have sex with [them]," and whether "there [was] any physical contact between you and [them] of a sexual nature." H. Dep. 29; *compare* 29 C.F.R. § 1604.11. In each instance, H. answered "no." J. Doe was likewise asked whether his coworkers ever made sexual advances or propositioned him, and like his brother he said they had not. J. Dep. 39–40; *see id.* at 41. Moreover, when H. was asked what kind of damages he sought to recover, he answered that he wanted a verdict that would send a message that "kids shouldn't have to put up with what adults give out." H. Dep. 75; *see* J. Dep. 74–75. A lawyer or a more sophisticated plaintiff might have used these rather narrow questions[29] to expound on the reasons why he was claiming sexual harassment, but we hardly think it dispositive that the plaintiffs (who were only eighteen at the time of their depositions) did not do so. Neither H. nor J. was ever asked a more general question as to why he felt sexually harassed, nor was either of them asked why or in what way he perceived the verbal and physical insults (which they spoke upon at length) to be harassing. It is quite clear, however, that they both experienced the environment as abusive. At the outset of his deposition, moreover, H.

---

**29.** The questions posed appear aimed at eliciting evidence of sexual advances alone, to the exclu-

sion of other sex-related conduct that may be actionable under Title VII.

affirmed that he had been sexually harassed (H. Dep. 5); thereafter, he repeatedly cited the verbal and physical conduct of his co-workers as examples of that harassment. *See* H. Dep. 5, 21–22, 22–23, 33, 37, 50. When asked to relate "what the atmosphere was like" during his summer employment, H. described it as "very abusive." H. Dep. 50. Similarly, J. said he thought that the language his co-workers had used was harassing (J. Dep. 50), that their conduct bothered him (*id.* at 56), and that he had felt threatened (*id.* at 56–57). Indeed, H. and J. did complain to at least one person (Bonnie Boeving) about the abuse, and it is presently undisputed that it was the harassment that led both of them to quit their jobs. *See Dey,* 28 F.3d at 1454. Ultimately, in fact, both brothers spoke to the adverse emotional impact that the harassment had upon them. As H. testified:

A. . . . [I]t's one thing when you know somebody and, you know, my brother, you know, or just somebody you've known for a long time and they might hassle you a little bit, but when you don't know somebody, you don't know them at all and they start calling you a fag and a queer and it's day after day after day, you know, it got to me. I mean sometimes somebody would say something and, you know, I'd almost start crying. It was just—

Q. How else would it affect you?

A. Just—it got to me emotionally. I mean like I said, sometimes I just felt like breaking down and crying. I mean it just—I don't know, just basically—

Q. Can you describe except for what you've told me, can you describe those emotional feelings, any of them any further?

A. Just feeling like there is nothing I could do about it. I mean it just seemed like, you know, there ain't nothing you can do. . . .

H. Dep. 61–62; *see* J. Dep. 74 ("It just makes me aware of what people can do and the

power they can have over you."); *id.* at 73 ("After that, I just—I go to work and that's it. If you say something to me, then I'll answer your question, but I'm not going to strike up a conversation with you"); *see also id.* at 81–82 (noting that the harassment affected him mentally, and that his grades in school suffered).[30] Finally, although the district court construed H.'s complaints about the "conditions that kids are put through" by adults (*see* Order at 5, quoting H. Dep. 75; *see also* J. Dep. 74–75) as a signal that the case was not about sexual harassment in the brothers' eyes, in fact H. explained, albeit in a bit of an awkward way, that an award of damages would help him achieve his goal by recognizing "some kind of sexual harassment right." H. Dep. 76. All of this is more than enough evidence to permit the factfinder to conclude that each of the brothers subjectively experienced his workplace as hostile. They adequately detailed the incidents of harassment, it is clear that they experienced them as harassment, and the harassment had a significant impact upon them. They need show no more.

### 8.

■■■ In sum, we find that H. is entitled to a trial on his hostile environment claim. Granting him the benefit of the inferences that reasonably may be drawn from the evidence before us, it is clear that a reasonable factfinder could conclude H. was harassed sexually and that his gender played a significant role in that harassment.

### 9.

Whether the harassment that J. Doe experienced fairly may be described as gender-based is a closer question. As our summary of the facts reveals, the verbal harassment directed at J. for the most part lacked the explicit references to sex and gender that characterized the harassment of his brother. Dawe's query whether H. might have passed along his case of poison ivy to J. by having anal sex with him stands out as one exception; there is also some suggestion in the

---

**30.** Not surprisingly, these are precisely the types of feelings that women have experienced when they have been sexually harassed in the workplace. *See* MacKinnon, Sexual Harassment of Working Women at 47; *see also, e.g., Bell v. Crackin Good Bakers, supra,* 777 F.2d at 1500.

summary judgment memoranda below that *on occasion* J. was, like H., referred to as a "bitch" or "queer." *See* R. 20 at 6–7. This is not to say, however, that we must necessarily ignore the harassment directed at H. in evaluating J.'s claim; we have, for example, noted that *gender-related remarks in the workplace might support an employee's Title VII claim although the remarks were not directed at her in particular. Dey,* 28 F.3d at 1456 (collecting authorities); *see also Andrews,* 895 F.2d at 1485–86. Here, J. witnessed first-hand most if not all of the verbal and physical harassment inflicted upon his brother and worked side-by-side with him. He might therefore argue that this harassment *rendered the working environment hostile* not only for H., but for himself as well. To date, the plaintiffs have not attempted to advance such an argument; but on the other hand, as we have noted, neither the city nor the district court attempted to distinguish the harassment that J. suffered from that endured by his brother. The briefs, as well as the summary judgment papers below, have addressed the claims of the brothers as *if they rise or fall together.* So be it. Given that the brothers faced the same working environment, it is possible that J. could persuade the factfinder that the harassment he allegedly endured amounts to sex discrimination as well. The city has advanced *no basis* for us to conclude otherwise.

## C. Retaliation

■■■■■ Both Does contend that they were discharged in retaliation for airing their discontent with the harassment inflicted by their co-workers in the Cemetery Department. In order to make out a prima facie case of retaliation under Title VII, a plaintiff must offer evidence that he engaged in protected activity that resulted in an adverse employment decision. *Koelsch v. Beltone Elecs. Corp.,* 46 F.3d 705, 708 (7th Cir.1995); *Dey,* 28 F.3d at 1457, 1458. Here, the Does contend that their complaint to city employee Bonnie Boeving qualifies as protected activity under Title VII, and that the verbal thrashing and toss of a firecracker at H.— which they posit as a retaliatory constructive discharge—resulted from that complaint. The district court dismissed the Does' retali-

ation claim on the strength of its conclusion that they had insufficient evidence of sexual harassment. Order at 5. Yet, even if the harassment claims of both plaintiffs lacked adequate support in the record, the retaliation claim was not necessarily doomed. A *plaintiff need only have a good faith belief that he is challenging conduct proscribed by Title VII in order subsequently to be able to* claim retaliation. *E.g., Dey,* 28 F.3d at 1458.

■■■■ Nonetheless, we find the record inadequate to support the inference that the Does' co-workers retaliated against them for engaging in protected activity. The Does did inform Boeving to some extent of the harassment that had convinced them to quit their jobs, although it is unclear that they detailed their experiences sufficiently for her to perceive them as complaining of sexual harassment. Even if they did, the subsequent abuse heaped upon the Does by their co-workers appears to have been motivated, so far as the record reveals, by the discovery that the Does were not, as they had told their fellow cemetery workers, moving to Oklahoma. There is, in other words, no evidence suggesting that the Does' harassers had learned that the Does had complained to anyone of the harassment and that they were retaliating for that reason. Belleville was therefore entitled to summary judgment on the retaliation claim.

## D. Equal Protection

This court has previously recognized that acts of sexual harassment intentionally directed at a person because of his sex may violate the Equal Protection Clause of the Fourteenth Amendment. *Bohen,* 799 F.2d at 1186–87; *see also Trautvetter v. Quick,* 916 F.2d 1140, 1148–49 (7th Cir.1990). We have already concluded that the record is sufficient at this juncture to support the Does' Title VII hostile environment claim, and we also find the record adequate to support the finding of discriminatory intent that their Equal Protection claim requires. As we have discussed, the evidence permits the inference that H. was singled out for harassment because, in wearing an earring, he departed from what his co-workers deemed

within the realm of appropriate masculine appearance. Whether the harassment directed at J. Doe reflects a discriminatory intent, or whether the intent that may be inferred from the harassment of H. is enough to support J.'s equal protection claim, are questions that cannot be answered based on the limited arguments before us. Again, the city has not attempted to draw distinctions between the brothers in terms of the harassment they experienced. Like H., J. is therefore entitled to a trial on the equal protection claim.

We are less confident that the harassment to which the Does allegedly were subjected can be attributed to Belleville as a "policy or custom" of the city as it must if Belleville is to be held liable under 42 U.S.C. § 1983. *See* 799 F.2d at 1188–89. Among the factors the cases cite as relevant to this determination are the involvement of supervisory and management personnel in the discrimination complained of, and the policies and procedures (if any) that the municipality had in place to discourage and deal with such discrimination. *Id.* at 1189. It is noteworthy here that the plaintiffs' supervisor is alleged not only to have known about, but to have participated in the harassment, and the evidence is mixed as to whether the Cemetery Department had any policy governing sexual harassment prior to the Does' departure. *See* R. 30, Letter dated Sept. 3, 1992 from Robert J. Sprague to Lynn Bruner, EEOC, at 2 (denying existence of any policy regarding sexual harassment); Goodwin Dep. 59–62 (recalling receipt, at some time before or after Does' employment, of manual which contained provisions regarding sexual harassment). This is not, in any event, an issue that Belleville raises on appeal or that it pursued below. The Does were under no obligation to put forward evidence that would satisfy the prerequisites to municipal liability, when the city itself did not seek summary

judgment on that ground. *Hartman v. Board of Trustees of Community College Dist. No. 508*, 4 F.3d 465, 469 (7th Cir.1993) (citing *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989)). Consequently, although we share some of our colleague's reservations on this score (*see post* at 602), we believe it inappropriate for us to say anything definitive in the absence of a developed record on the point. We leave this for the district court to sort out on remand.

### IV.

For the reasons set forth above, we reverse the district court's grant of summary judgment in favor of Belleville as to H. and J. Doe's Title VII hostile environment and Equal Protection claims, but affirm the entry of summary judgment as to their Title VII retaliation claim. The case is remanded to the district court for further proceedings consistent with this opinion. The Does shall recover their costs of appeal. See Fed. R.App.P. 39(a).

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

MANION, Circuit Judge, concurring in part and dissenting in part.

I agree with the court's conclusion that same-sex discrimination can be actionable under Title VII, but I reach that conclusion in more narrow circumstances and for different reasons. In view of those reasons, I do not agree that Title VII protects against the behavior that the Does experienced in this case, and thus I dissent from the court's reversal of the district court's decision granting judgment to the City of Belleville. For the same reason I dissent from the court's reversal of the Does' equal protection claim. I concur with affirming the dismissal of the retaliation claim.[1]

---

1. In response to a request from the Supreme Court, the Justice Department submitted a brief analyzing whether the Court should hear *Oncale v. Sundowner Offshore Services Incorporated*, 95 F.3d 56 (5th Cir. 1996), a case involving same–sex harassment. Although the DOJ was skeptical whether this case was sufficiently developed factually and legally, it did conclude that some degree of same–sex discrimination was action-

able under Title VII. The Court has since granted certiorari on the case to be heard in the next term. —— U.S. ——, 117 S.Ct. 2430, 138 L.Ed.2d 192 (1997). The Fifth Circuit's holding is that no cause of action exists under Title VII for same–sex discrimination. Of course neither my colleagues nor I take that position here. (While that strict position is arguably the intent of Congress, the plain meaning of the statute will

## I.

Although the Doe brothers were twins, apparently they were not alike in stature or dress. When they showed up for their summer job at the graveyard operated by the City of Belleville, H. was wearing an earring and J. was apparently overweight. Jeff Dawe and the other members of the full-time crew—all considerably older than the two sixteen-year-olds—quickly labeled H. as the "fag" or the "queer" and J. as the "fat boy." Assuming the facts most favorable to the plaintiffs, as we must when defendants seek summary judgment, Dawe spearheaded a relentless verbal attack on H., accusing him in front of the others of being homosexual, and taunting him with threats of anal sex. Other members of the crew, including the supervisor Stan Goodwin, encouraged and participated in this crude banter. This mean-spirited teasing continued daily until Dawe, after returning from lunch in a somewhat inebriated state, grabbed H. by the crotch and declared to the other crew members "Well, I guess he is a guy." Instead of Dawe being fired on the spot for the physical assault, it was business as usual at the graveyard, which presumably included the verbal taunting. The Does did not report the assault (or any of the verbal abuse, for that matter) to anyone. Instead they invented a reason for quitting and ultimately did. They then filed this lawsuit against the City claiming among other things violations under Title VII—specifically sexual harassment.

The question before us is simple, but as indicated by the length of the court's majority opinion, the answer is quite complicated. Simply put, can a person of the same sex (here, male) have a claim under Title VII not only for sex discrimination, but also sexual harassment in a workplace? Of course, Title VII is our starting point: it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1).

Nothing in the language of Title VII limits its protection against sex discrimination to persons discriminated against by someone of the opposite sex. Nor would such a limit seem logical in certain circumstances. Consider for instance the case of a female supervisor who refuses to promote a woman into a sales position because the supervisor believes that a woman should not hold a position that requires overnight travel. Given that motive, the supervisor's decision is illegal sex discrimination under Title VII because she is discriminating against the subordinate because of her sex—female. As would the case of a male supervisor who fires a male receptionist because he prefers that a woman have the job of greeting customers that come into the office; the supervisor terminated the receptionist because of his sex-male. Applying the plain language of Title VII leads to the inevitable conclusion that discriminating against someone because of that person's sex is illegal, even if the discriminator is of the same sex as the victim.

These examples, however, involve cases of sex discrimination, not hostile work environment claims. Yet consistency requires us to examine the possibility of same-sex hostile work environment claims. In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), the Supreme Court agreed with the majority of lower courts that treated sexual harassment claims as a form of sex discrimination. Meritor made sexual harassment a subset of sex discrimination, *i.e.*, sex discrimination is a general category of unlawful activity of which sexual harassment is a specific example. Accordingly, sexual harassment should share the attributes of a sex discrimination claim. In other words, if it is possible for a man to state a claim of sex discrimination against his male supervisor then it follows that a man could also state a claim of sexual harassment against that same superior.

A clear case of same-sex sexual harassment occurs when an employee makes overt sexual advances on another employee of the same sex. Just such a scenario occurred in

not support it.) Therefore, the Court will soon decide the degree to which same–sex discrimination is actionable No doubt this and other circuit court cases that have been published since *Oncale* will supplement the factual and legal analysis that the DOJ concluded *Oncale* lacked.

*Yeary v. Goodwill Industries–Knoxville, Inc.,* 107 F.3d 443 (6th Cir.1997). There a male coworker asked a newly-hired male for a date and subsequently persisted with offensive sexual conversation, touching, and outright propositioning in person and on the telephone. This was a clear case where the harasser targeted someone of the same sex, not because of hostility, or animosity, but because of the individual's sex.

> There is no question that Yeary has sufficiently alleged that he was harassed "because of" his sex. He claims that because he is a male, he was subjected to objectionable treatment to which women employees at Goodwill were not subjected. The complaint does not suggest that Yeary was targeted by Lee because Yeary was mentally disabled, or because Yeary was prudish about sex, or because of any of the other non-sex-based reasons that have presented themselves in other cases. The complaint suggests, instead, that Lee was targeting Yeary for sexual attention because Yeary was a male and he was attractive to Lee. If true, this creates an institutional disadvantage for Yeary in working at Goodwill, simply by virtue of the fact that he is a man. He had to put up with abuse and harassment that women there did not have to endure.

*Id.* at 448.

Similarly, in *Fredette v. BVP Management Associates,* 112 F.3d 1503 (11th Cir.1997), where a homosexual male maitre d' sexually harassed a male waiter, the Eleventh Circuit held that the waiter could maintain a Title VII claim against their restaurant-employer for same-sex sexual harassment. The Eleventh Circuit reasoned that "where a homosexual male propositions another male [t]he reasonably inferred motives of the homosexual harasser are identical to those of the heterosexual harasser—i.e., the harasser makes advances towards the victim because the victim is a member of the gender the harasser prefers." *Id.* at 1505. The Eleventh Circuit then reversed the district court's grant of summary judgment to the restaurant because Fredette had proffered evidence that "he was the victim of sexual advances to which members of the opposite gender were not subjected."

*Yeary* and *Fredette* involved clear cases of actionable same-sex sexual harassment because the harassers' motives were clear. So were the motives clear with the hypothetical examples of the female supervisor who would not promote a female subordinate to a challenging sales position or the male employer who fired the male receptionist. Each acted the way they did because of the victim's sex. But the two hypotheticals were not hostile environment sexual harassment cases. It would be much more difficult to transpose the sales position and the receptionist hypotheticals into a same-sex sexual harassment claim because the harasser's motive still has to be because of the victim's sex, and other than the situation in *Yeary* and *Fredette,* it is difficult to devise a scenario where such a motive would exist.

While same-sex sexual harassment claims may be actionable, such claims cannot be separated from the statute from which they evolved. After all, Title VII requires that the discrimination be "because of such *individual's* sex," and does not expressly provide for sexual harassment claims. Yet, as the Supreme Court stated in *Meritor,* "without question, when a supervisor sexually harasses a subordinate because of the *subordinate's sex,* that supervisor 'discriminates on the basis of sex.'" *Meritor,* 477 U.S. at 64, 106 S.Ct. at 2404 (emphasis added). Because sexual harassment claims are derived from Title VII's "because of such individual's sex" language, such claims likewise must be based on harassment meted out "because of such individual's sex." This is why the Supreme Court originally defined sexual harassment in terms of sex discrimination: "discrimination based on sex [that] has created a hostile or abusive work environment." *Id.* at 66, 106 S.Ct. at 2405. In the context of a hostile work environment claim, this means that the victim suffers the harassment because he is a man and not a woman, or because she is a woman and not a man. *Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1085 (7th Cir. 1984).

In short, motive is dispositive, for while *Meritor* interpreted Title VII to prohibit sex-

ual harassment, at the same time it limited such claims to hostile work environments created because of the individual's sex. This limitation was reaffirmed by *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), where throughout its main opinion the Court rearticulated *Meritor*'s holding that Title VII prohibits only those work environments made hostile or abusive to employees because of discrimination based on the individual's race, sex, religion, or national origin. *See, e.g., Harris,* 510 U.S. 17, at 18, 114 S.Ct. 367, at 369, 126 L.Ed.2d 295 ("In this case we consider the definition of a *discriminatorily* 'abusive work environment' ... under Title VII") (emphasis added); *id.* at 21, 114 S.Ct. at 370 (affirming *Meritor*'s holding that Title VII's prohibition against discrimination in the "terms" or "conditions" of employment is violated whenever an employer "require[s] people to work in a *discriminatorily* hostile or abusive environment") (emphasis added); *id.* at 22, 114 S.Ct. at 371 (Title VII is offended whenever "discriminatory conduct [is] so severe or pervasive that it create[s] a work environment abusive to employees *because of their race, gender, religion, or national origin*") (emphasis added). This proposition was reinforced by both concurring Justices. *See id.* at 25, 114 S.Ct. at 372 (the test for whether an employer has impermissibly altered an employee's "conditions of employment" "is not whether work has been impaired, but whether working conditions have been *discriminatorily* altered") (Scalia, J., concurring) (emphasis added); *and id.* ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed") (Ginsburg, J., concurring). Thus to make out a sexual hostile work environment claim a plaintiff must demonstrate that he was subjected to the harassment or abuse "because of his sex." That is the test. 42 U.S.C. § 2000e–2(a)(1). *See also Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir.1994) ("The first [question] is whether the plaintiff was, because of her sex, subjected to such hostile, intimidating, or degrading behavior, ... as to affect adversely the con-

ditions under which she worked...."); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446 (7th Cir.1994) (recognizing that "the test under Title VII is not whether work has been impaired, but whether working conditions have been *discriminatorily* altered") (quotations and citations omitted) (emphasis added).

In *Ulane*, 742 F.2d at 1085, this court also made clear that Title VII's prohibition of discrimination "because of such individual's sex" means that it is "unlawful to discriminate against women because they are women and men because they are men." In other words, "Congress intended that the term 'sex' in Title VII mean simply 'man' or 'woman.'" *See Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 749 n. 1 (4th Cir.1996) (Niemeyer, J., concurring). Or, more appropriately, in Congress' own words, it is unlawful to discriminate against an individual "because of such individual's ... sex." *DeCintio v. Westchester County Medical Center,* 807 F.2d 304, 306–07 (2d Cir.1986) ("Sex" refers to membership in a class delineated by gender rather than sexual activity); *DeSantis v. Pacific Tel. & Tel. Co., Inc.*, 608 F.2d 327, 329–30 (9th Cir.1979) ("Title VII's prohibition of 'sex' discrimination is on the basis of gender, and should not be judicially extended to include sexual preferences such a homosexuality"); *Smith v. Liberty Mut. Ins. Co.*, 569 F.2d 325, 327 (5th Cir.1978) (same). The reason is apparent when we look at the other groups of persons afforded protection by Title VII. In making certain employer actions unlawful, Congress Prohibited discrimination against individuals because of their status as a member of certain classes drawn along the lines of race, color, religion or national origin. It is precisely—and only—in this context that the prohibition against discrimination "because of such individual's ... sex" appears. Thus,when Congress outlawed discrimination "because of such individual's sex," it proscribed differentiating among individuals because of the employee's status as a man or woman. *See, e.g., DeCintio v. Westchester County Medical Center,* 807 F.2d 304, 306–07 (2nd Cir.1986); *Hopkins,* 77 F.3d at 751. If the harassment was motivated by the victim's sex (and it is severe and pervasive enough to alter the terms and conditions of employment), then it is illegal; if

not motivated by the victim's sex, then it is not a violation of Title VII.

The specific question, then, is whether the sexual harassment, the abusive environment created by the Belleville cemetery crew, was because of the fact that H. Doe was a male. In a same-sex hostile environment case it will be very difficult to satisfy this burden, because when a man harasses a man, or a woman harasses a woman, it is not reasonable to infer that the harassment was "because of such individual's ... sex." As the court in *McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191 (4th Cir.1996), explained:

> [W]e do not believe that in common understanding the kind of shameful heterosexual-male-on-heterosexual-male conduct alleged here (nor comparable female-on-female conduct) is considered to be "because of" the [victim's] "sex." Perhaps "because of" the victim's known or believed prudery, or shyness, or other form of vulnerability to sexually-focussed speech or conduct. Perhaps "because of" the perpetrators' own sexual perversion, or obsession, or insecurity. Certainly, "because of" their vulgarity and insensitivity and meanness of spirit. But not specifically "because of" the victim's sex.

*McWilliams*, 72 F.3d at 1195–96.

In *Hopkins*, 77 F.3d 745, the concurrence recognized the same reality, but from a slightly different angle: "When someone sexually harasses an individual of the opposite gender," a "presumption arises that the harassment is 'because of' the victim's gender."

> This presumption is grounded on the reality that sexual conduct directed by a man, for example, toward a woman is usually undertaken because the target is female and the same conduct would not have been directed toward another male. But when the harasser and the victim are of the same gender, the presumption is just the opposite because such sexually suggestive conduct is usually motived by entirely different reasons.

*Hopkins*, 77 F.3d at 752 (Niemeyer, J., concurring). The presumption of which Judge Niemeyer wrote in Hopkins, however, is not a presumption in the burden-shifting sense. *Id.* Rather, it is the recognition that what is a reasonable inference in opposite-sex cases is not reasonable in same-sex cases.

In this case, it is not reasonable to infer that Dawe harassed H. because H. was male, and not female. None of the comments Dawe made indicates that he subjected H. to harassment because he was a male. The moment H. Doe appeared at work, Dawe saw his earring and proceeded to call him a "fag" and "queer." Dawe told him to "go back to San Francisco with the rest of the queers." The statements as to whether H. Doe is a "boy or a girl" also do not indicate any discriminatory motive against either males or females. Finally, and certainly troubling beyond the sexual harassment issue, is Dawe's physical assault of H. Doe. When Dawe grabbed H. Doe by the crotch he committed a criminal act, as well as a civil battery. He should have been fired immediately and been reported to the local police. Even this battery, however, does not create a reasonable inference that Dawe discriminated against H. Doe because he was male. In fact, this isolated criminal act should not overshadow and thus distort the issue at hand—whether the day-to-day verbal abuse suggesting degrading sexual acts to be imposed upon Doe by Dawe constitutes actionable sexual harassment. It did not. The harassment, while disgusting and intimidating, occurred because Dawe and the others found fault (and perhaps entertainment) because H. Doe wore an earring, not because H. was a male.

The case against J. is even weaker; it is completely void of any evidence that J. was harassed because he was a man. The crew members chided J. because they thought he was fat. Grown men calling a sixteen-year-old "fat boy" is needlessly cruel and offensive. Although it violates normal senses of decency (there seems not to be much decent about this graveyard crew) it does not violate Title VII. The one "sexual" comment directed at J.—that J. could have gotten H.'s poison ivy from anal sex with him—was an isolated comment, although similar to those usually directed at H. No matter how inappropriate or crude, the remark does not support the conclusion that Dawe harassed J.

because he was a male; rather the evidence established that J. was harassed because the coworkers thought he was overweight. Therefore, J. cannot succeed on his claim of sexual harassment and the City of Belleville was entitled to summary judgment.

Likewise I believe that the City of Belleville is entitled to summary judgment on the equal protection claim. Initially, summary judgment is required on the equal protection claim for the same reason it is required on the Title VII claim, namely because the evidence fails to demonstrate that the Does were discriminated against because of their sex. However, there is an entirely separate reason: the Does failed to present any evidence that the City of Belleville had a custom or policy of discrimination. While the court believes that we need not address this point because Belleville did not raise the issue on appeal, it is the Does' burden to present sufficient evidence entitling them to judgment, and the record fails to create the requisite inference that the City of Belleville had a custom or policy of discrimination. Additionally, contrary to the court's pondering, the absence of a sexual harassment policy does not create a policy of sex discrimination. Nor can the knowledge or participation of a low level supervisor, like Goodwin, establish a custom or policy of discrimination. Rather, in the context of § 1983, an official custom or policy may only arise if there is an express policy, a widespread practice that is so permanent and well settled as to constitute a custom or usage, or discrimination caused by a person with final policy making authority. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir.1995). None of these circumstances exist here. Absent evidence of such a custom or policy, the City of Belleville is entitled to summary judgment on the Does' equal protection claim.

## II.

Because I agree with the court that in certain circumstances same-sex harassment is actionable under Title VII, it is necessary to draw a bright line to underscore why I disagree with the court's conclusion that the Does, especially H., have a valid claim. The court concludes that the Does have presented sufficient evidence to reach a jury on both their Title VII and equal protection claims. In reaching these conclusions, the court sees no difference between cases involving same- or opposite-sex harassment. In the court's opinion, the same inferences arise. But this conclusion must be considered in light of the court's view that motive should be irrelevant and that, in effect, "sexuality harassment"— harassment somehow sexual in nature—is prohibited by Title VII. *See ante* at 580 ("H. Doe apparently was singled out for this abuse because of the way in which he projected the sexual aspect of his personality . . . ."); *ante* at 593 ("whether his harassers were motivated by his sex, by his purported sexual orientation, or by some other factor, it would seem that he has been harassed sexually and his gender necessarily implicated.").

I contrast "sexuality" with the statutory language "because of such individual's . . . sex." My colleagues use seventy-plus pages to tiptoe away from the plain language of the statute in order to greatly expand the horizon on which a litigant can identify sexual harassment by coworkers or supervisors of the same sex. Incredibly, as this court now sees it, sexual harassment need not constitute discrimination "because of such individual's sex," i.e. because the victim is a man and not a woman, or visa versa, *Ulane*, 742 F.2d at 1085, in order to be actionable under Title VII. Rather, if raunchy sexual banter is directed at an employee by coworkers of the same sex because they do not like him, do not respect him, want to tease him, want to embarrass him, or simply want to "initiate" him into a rather disgusting workplace, under the court's new standard employees targeted by such mean-spirited teasing could have a claim merely by the sexual nature of the teasing. Perhaps judges think an expansion is necessary because Congress has not sufficiently asserted itself in cleaning up such workplaces. But that is not the court's role. We must apply the law as Congress enacted it rather than to amend it to "correct" workplace situations the court does not like. See *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 430 (7th Cir.1995) (Title VII "is not designed to purge the workplace of vulgarity.").

The court at least repeats the well-established principle that a Title VII claim requires that the discrimination (or here harassment) be "because of such individual's sex." *Ante* at 569 ("[g]iven that sexual harassment is actionable under Title VII as a form of sex discrimination, courts typically speak of the threshold question presented by a sexual harassment claim as being whether the plaintiff was harassed 'because of' her sex"). Yet, the undercurrent of the court's entire opinion is that *sexuality harassment* is prohibited by Title VII. *See ante* at 576 ("It is not clear why such proof is needed when the harassment has explicit sexual overtones, however."); *ante* at 577 (questioning "whether it is appropriate to view sexual harassment as actionable sex discrimination only when the plaintiff is able to show that she was harassed because she was a woman *rather than* a man, or vice versa."); *ante* at 576 (citing EEOC's guidelines and stating that the guidelines do not "focus on whether the harasser singled out the victim on the basis of her gender"). Let there be no mistake that what my colleagues actually question is whether Congress should have passed a broader law—one that prohibits all harassment in the workplace that has sexual overtones or language. But the Title VII that Congress passed prohibits harassment only if it is "because of such individual's sex," (or race, color, religion, or national origin) and only then if it is severe and pervasive enough to alter the terms and conditions of employment.[2]

Throughout the opinion the court shifts the focus from the statutory language ("because of such individual's ... sex") to what generally can be called "sexuality." It does so almost immediately, when, after setting forth the requirement that to be actionable, sexual harassment must be "because of such individ-

ual's sex," *see supra* at 569, the court quickly rephrases the question as whether the "harassment ... is in some way linked to the plaintiff's sex," *ante* at 570, or whether there is "a nexus between the harassment and the plaintiff's gender...." *Ante* at 570. *See also ante* at 576 (questioning whether there is "the nexus to the plaintiff's gender that Title VII requires.") With the question restated, the court begins to question why proof of discriminatory intent is "needed when the harassment has explicit sexual overtones...." *Ante* at 576. Here the court examines the content of the harassment held actionable in other Title VII cases brought by women for harassment by men, implying (in some places even stating) that it is the "sexual overtones," *ante* at 576, or the "sexual nature," *ante* at 570, or the "sexual content." *ante* at 575, or the "sexual character," *ante* at 575, of the harassment that makes it illegal. By concentrating on the sexual content of the harassment, the court has shifted the focus from the individual's sex (male or female) to sexuality: "H. Doe apparently was singled out for this abuse because of the way in which he projected the *sexual aspect* of his personality.... " *Ante* at 580. With the much broader focus on sexuality, it seems entirely natural that the court questions "whether it makes a whit of difference why he was singled out for abuse; whether his harassers were motivated by his sex, by his purported sexual orientation, or some other factor, it would seem that he has been harassed sexually and his gender necessarily implied." *Ante* at 593. After all, "[f]rom [the victim's] point of view, and from the perspective of any reasonable person, the harasser's motives are immaterial." *Ante* at 579.

---

**2.** The court also clouds the issue by focusing on the "severe and pervasive" requirement. For example, the court states that "[f]ears that if such a requirement is not imposed, commonplace 'horseplay' will give rise to sexual harassment claims are, we believe, unfounded. Sexual harassment law already provides the means for distinguishing between isolated instances of non-severe harassment and the truly hostile working environment." *Ante* at 575. That may well be true—although "drawing the line is not always

easy," *Baskerville,* 50 F.3d at 430—but that is not the issue. The issue is how do we distinguish same-sex sexual harassment meted out because of the victim's sex from horseplay, or even a truly hostile working environment, created for some reason other than the victim's sex. Sexual harassment law, as the court presents it, does not provide a means for distinguishing between same-sex sexual harassment which is because of the victim's sex, and that which is not; no matter how severe or pervasive the harassment, only the former is actionable.

This is startling because the harasser's motives are *not* immaterial. They are dispositive. Title VII prohibits discrimination "because of such *individual's* sex." This means that the "victim" suffers harassment because he is a man and not a woman, or because she is a woman and not a man. That was our holding in *Ulane*, 742 F.2d at 1085, and nothing has altered our interpretation of the word "sex" since then. Title VII does not prohibit discrimination on the basis of "sexuality," "sexual orientation," "something linked to sex," or anything else—only discrimination (or more specifically here, harassment) because the victim is a man, or because the victim is a woman.

Without deciding the issue, the court indicates that no proof beyond the content of the harassment is necessary to satisfy the "because of such individual's sex" element. *See ante* at 576 ("It is not clear why such proof is needed when the harassment has explicit sexual overtones, however.") Just because the harassment is overtly sexual, however, does not mean that it was motivated by the victim's sex. Again, this is the difference between "sex," as used in the statute to mean a biological fact, and "sexuality," as used by the court to mean sexual overtones, sexual content, sexual character, and so on. In some cases, the words used by a harasser degrade one sex and reveal an obvious discriminatory intent. But for the most part those words are relevant only because they determine whether the harassment is objectively and subjectively abusive enough to fall within the purview of Title VII. The words generally do not answer the crucial threshold question: what motivated the abuse?

In implying the contrary, the court seemingly reasons that because courts in opposite-sex cases have easily found harassment actionable under Title VII where the harassment is explicitly sexual, the mere sexual nature of the harassment by someone of the same sex is sufficient to establish that the harassment was because of the individual's sex. We must emphasize the distinction between comments explicitly sexual, and comments derogatory or focused on one sex. Most of the decisions the court relies upon concern the latter. *Ante* at 577, nn. 10–11.

And therefore those opposite-sex decisions do not support the proposition that the sexual nature of comments creates the inference of sex discrimination. Additionally, these decisions involve the typical situation of a male harassing a female. In these cases the courts were not asked to consider whether the harassment was "because of such individual's sex" because in the typical case the discriminatory nature of the conduct is readily apparent: a woman has been targeted with offensive behavior by a man or men, but no men were targeted, Courts deal with the facts and arguments presented, so the fact that the courts have never questioned whether male-on-female harassment of an explicit sexual nature was "because of such individual's sex" does not mean that we need not look for such proof. Such evidence would be lacking, even if the harassment were explicitly sexual in nature, if the facts of the case demonstrated that the harassment of a worker was motivated not because of the individual's sex, but for some other reason (for example, animus). Such a case would be appropriate for summary judgment.

The court compares sexual harassment to racial harassment (*ante* at 579–580). But my colleagues misconstrue their own analogy. As the court points out, when a black person is subjected to racial slurs and talk of lynching by white coworkers. "we typically do not ask, 'But was he singled out because of his race?'" Of course not. White workers making such statements to a black coworker automatically ignite an inference of racial harassment. But what if the workers involved are all black? If black workers use racial slurs to demean a black coworker, undoubtedly the remarks hurt and are derogatory. But are the racial slurs directed by several black men against another because the victim is black? The reasonable inference is "no." If several blacks hurl racial slurs at another, it is not likely because the target is black. Instead, they probably want to hurt, malign, challenge, or criticize him for some other reason—he was anti-union; he supported the wrong political candidate; he was working too slow, holding up the others—or any reason. Importantly, the reason counts. Without some showing that it was

because of his race, racial discrimination cannot be reasonably inferred where the workers were all black.

Nor is same-sex harassment likely sex discrimination. As the court points out, workplace discrimination can be diffused when a supervisor simultaneously harasses subordinates of different racial and ethnic backgrounds choosing an epithet or symbol that will be uniquely hurtful to particular subordinate. *Ante* at 579–580. That assumes, of course, the supervisor does not share the background that he is derogating. But there are only two sexes. The harasser and the victim must be one or the other. When a male worker is making paltry sexual remarks to or about a male coworker, the automatic response is not that he is saying these things because the target of the offensive talk is male. For a Title VII sexual harassment claim to exist, the target must show more, such as in *Yeary* and *Fredette* where a homosexual man was harassing another man because he was a man—a man the harasser found sexually attractive. Otherwise the inference is that the male harasser uses the sexual gutter-talk to mock, hurt, criticize, intimidate, or otherwise denigrate the other male because of some animosity, jealously, antipathy, or even hate. Without more it is unreasonable to infer that the harassment was meted out because he is a male.

My colleagues underscore our divergent views on this subject. "If [Doe] were a woman, there would be no agonizing over whether the harassment the plaintiffs have described could be understood as sex discrimination." *Ante* at 575. I could not agree more. If Dawe and the coworkers treated a woman coworker this way the immediate inference would be sexual harassment because of her sex. But the court goes on to say "[t]he happenstance that he is instead male should not make for an entirely different analysis, particularly for purposes of a statute that forbids sex discrimination." *Id.* Wrong. A different analysis is entirely in order. Suppose Dawe and the offending coworkers this hypothetical woman encountered at the graveyard were also all women? The immediate and only reasonable inference is that they are harassing her for a reason

other than the fact that she was a woman. Substitute a man in place of the woman victim in all of the opposite-sex cases cited by the court, and we come up with the same inevitable result—the harassment is not because of the victim's sex.

So what kind of evidence is relevant and necessary in a hostile work environment case? The same type of evidence used in *any* sex *discrimination* case—evidence establishing the discriminatory nature of the conduct. In the usual case, where a male harasses a female. this is not difficult; a woman is typically targeted by a man or men with offensive behavior and no men are targeted. We ask the same question in a same-sex harassment case: what motivated the harassment? The same proof may exist. The harasser may target only one sex, albeit the same sex. If severe and pervasive that harassment would be illegal. *McKinney v. Dole,* 765 F.2d 1129, 1138 (D.C.Cir.1985) ("[A]ny harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII."). See also *Spain v. Gallegos,* 26 F.3d 439, 447, 449 (3d Cir.1994); *cf. Vore v. Indiana Bell Tel. Co.,* 32 F.3d 1161, 1164 (7th Cir.1994). For instance, in *Yeary* the court specifically relied on the fact that the male harasser targeted men, but not women, in holding that same-sex harassment was actionable under Title VII. Likewise in *Fredette,* the Eleventh Circuit relied on evidence proffered by Fredette "that he was the victim of sexual advances to which members of the opposite gender were not subjected " 112 F.3d at 1505.

Proof of discrimination against the Does because of their sex is made more difficult because the harassment occurred in a single-sex workplace Perhaps it is because there is no gender comparison that this court resorts to the sexual nature of the harassment as proof that the harassment was "because of" the victim's sex. That is no excuse for abandoning the statute. The difficulty of proving discrimination because of the person's sex stems from the reality that when a man

harasses another man it is very unlikely that he is doing so because the victim is a man. *McWilliams* and *Hopkins* recognized this. *See supra* at 601. In other words, it is difficult to prove discrimination because there was no discrimination.

The court also rejects the position suggested in *McWilliams*, *Hopkins*, and *Wrightson* that same-sex harassment is actionable only if the harasser is a homosexual. As in *Yeary* and *Fredette*, this would be the most likely scenario for same-sex sexual harassment. But I agree that requiring such a fact to be alleged and proven as part of the prima facie case of sex discrimination would violate the direction in *O'Connor v. Consolidated Coin Caterers Corporation*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), that there be a logical connection between the prima facie case and the prohibited discriminatory criteria. I understand the reason some courts have added proof of homosexuality as an element of a sex discrimination case. As the Supreme Court recognized in *O'Connor*, "some courts have been induced to [add an element to the prima facie case] to avoid creating a prima facie case on the basis of very thin evidence. . . . ." In *O'Connor*, the Supreme Court noted that lower courts had added as an element to the prima facie case of age discrimination proof that the plaintiff was replaced by someone outside the protected class (there under 40). The Supreme Court rejected this prima facie element as not logically related to the question of whether the plaintiff had "lost out because of his age." In doing so, however the Court recognized that without such an element, it would "theoretically permit a case with very thin evidence to proceed (for instance a case where a 40–year–old was replaced by a 39–year–old)." The Court, however, also recognized "the proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion. . . . ." *O'Connor*, —— U.S. at ——, 116 S.Ct. at 1310. For instance, "[i]n an age-discrimina-

tion context, such an inference can not be drawn from the replacement of one worker with another worker insignificantly younger." *Id.* "The discrimination prohibited by the ADEA is discrimination 'because of [an] individual's age. . . .'" *Id.* (quoting 29 U.S.C. sec. 623(a)(1)).

Similarly, as in an ADEA case, here the solution is not to require a new prima facie element—proof that the harasser is a homosexual—but rather to recognize that the evidence as a whole must create an inference that the harassment was "because of such individual's sex." When a man harasses a man or a woman harasses a woman, it is not reasonable to infer that the harassment was "because of such individual's sex," absent probative evidence that the victim's sex was, in fact, the motivation. That is what McWilliams meant in stating: "[W]e do not believe that in common understanding the kind of shameful heterosexual-male-on-heterosexual-male conduct alleged here (nor comparable female-on-female conduct) is considered to be 'because of' the [victim's] 'sex.'" 72 F.3d at 1195–96. And that is the presumption of which Judge Niemeyer spoke in *Hopkins*. 77 F.3d at 752. As noted earlier, it is not a presumption in the burden-shifting sense, but rather it is the recognition that what is a reasonable inference in opposite-sex cases is not reasonable in same-sex cases.

In this court's view it does not seem to matter if it is same sex or opposite sex; the same inferences arise. But this is only after the court has shifted the issue from the victim's sex in particular to sexuality in general. Once that is done the court disposes of motive as the dispositive question. *See ante* at 580 ("H. Doe apparently was singled out for this abuse because of the way in which he projected the *sexual aspect* of his personality . . . ."). If the focus of the statute were sexuality and not the victim's sex, perhaps the same inferences could arise in same-sex harassment cases. But given the appropriate focus is the harasser's motive and the individual's sex, I cannot agree with the court's conclusion.[3]

---

**3.** I also cannot reconcile the court's conclusion with our holding in *Ulane*. *Ulane* made clear

that sex was not synonymous with "sexual identity," or "sexual preference." However, under the

The court also refers to the earring H. wore as evidence of sex stereotyping and thus sex discrimination. While sex stereotyping may constitute evidence of sex discrimination, it is not illegal in itself. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989) ("Remarks at work that are based on sex stereotypes *do not inevitably prove* that gender played a part in a particular employment decision. The plaintiff must show that the employer *actually relied on her gender* in making its decision.") (emphasis added). Additionally, any stereotypical statement must be viewed in light of all of the harassment, and as a whole the evidence must create the inference that the harassment was because of the plaintiff's sex. In *Price Waterhouse*, where the decision makers were all male, the Supreme Court in separate opinions concluded that the sex stereotyping created a sufficient inference of discrimination to warrant a trial. Yet, as the Supreme Court recognized in *O'Connor* in the age discrimination context, the inferences to be drawn will differ with the facts of each case, and sometimes will support a conclusion of discrimination, and other times cannot. And it does not create an inference that Dawe harassed H. because he was male; at most, it creates the possible inference that Dawe harassed H. because Dawe thought he was a homosexual, or more likely because Dawe did not like the earring and used it as a reason to ridicule H. as a means of entertainment for the other low-lifes on the graveyard crew. But we do not need to speculate. Even if Dawe really thought H. were a homosexual, that is not enough. Thus, the City of Belleville is entitled to summary judgment on H. Doe's Title VII claim of sex discrimination.

### III.

Accepting *Meritor*'s recognition of sexual harassment claims as a form of sex discrimination, we have no choice but to recognize same-sex harassment claims under Title VII. Claims of sex discrimination (and, in turn,

sexual harassment) against men by women, or even women by men, may be closer to the purpose of Title VII, but I see no basis for such a limitation in the language of the statute or elsewhere. Rather the limitation under the statute is the facts—how was the harasser's conduct motivated by the victim's sex. The language of the statute is not meaningless; unless the behavior at issue is motivated (at least in part) by the victim's sex, no cause of action can lie. It will be a truly rare case of same-sex harassment where this burden is satisfied. When a man harasses a man, or a woman harasses a woman, an inference does not arise that the harassment was because of the victim's sex. My colleagues assure us that the sky has not fallen, suggesting I suppose that federal courts will not be swamped by men or women claiming harassment by coworkers of the same sex, Perhaps not, but that never was the concern.[4] The concern always will be the standards by which we define a cause of action not specifically described in a statute, and our proper reluctance to extend such claims further and further away from their statutory moorings.

---

court's analysis both "sexual identity" and "sexual preference" would be related to and have a nexus with an "individual's sex," and thus harassment based on either would be actionable. This "sexuality" approach to Title VII cannot be harmonized with *Ulane*.

**4.** However, Chicken Little seems to be gaining credibility. See Walter K. Olson, *The Excuse Factory: How Employment Law Is Paralyzng The American Workplace* (1997).